CHIPLETS, Inc. v. JUNE DAIRY PROD-
UCTS CO., Inc. et al.
Civ. Nos. 11444, 443–50.

United States District Court
D. New Jersey.
July 20, 1953.

See also, 89 F.Supp. 814.

John H. Glaccum, New York City (Thorn Lord, Newark, N. J., of counsel), for plaintiff.

Harry C. Alberts, Chicago, Ill. (Harry Sommers, Newark, N. J., of counsel), for defendants and counter claimants.

SMITH, District Judge.

The plaintiff filed a complaint in which it charged the defendant June Dairy Products Co., Inc., with the infringement of two patents, Patent 1,967,972, hereinafter identified as '972, and Patent 2,201,872, hereinafter identified as '872. The defendant C. Doering & Sons, Inc., the manufacturer of the accused machines, herein after identified as the intervenor, inter-

vened in the action and filed an answer and counterclaim in which it challenged the validity of the patents and denied infringement. The intervenor in its counterclaim joined claims for damages and injunctive relief under Sections 4 and 16 of the anti-trust laws, Sections 15 and 26 of Title 15, U.S.C.A.

The intervenor thereafter filed a supplemental counterclaim in which it charged the plaintiff with the infringement of two patents, Patent 2,321,188, hereinafter identified as '188, and Patent 2,323,523, hereinafter identified as '523. The plaintiff filed a reply in which it challenged the validity of the patents and denied infringement.

### Rottenberg Patent.
### ('972)

The plaintiff is the owner of this patent, which issued July 24, 1934 on an application filed June 4, 1932. The original application covered a "Butter Printing and Cutting Machine," fully described in the specification, and contained twenty claims. The only claims allowed, however, were those which were limited to a single element of the machine, to wit, a combination Cutter and Stripper. The other claims were rejected on the ground, among others, that they covered nothing more than an aggregation of old elements known in the art and disclosed in earlier patents.

The only claims here in issue are 1, 5 and 6, and these are clearly limited to a positively actuated machine which cuts and divides a slice of butter into small segments or pats suitable for table use. The invention is defined in claim 5, which is typical, as follows: "In a machine of the class described, the combination of a cutter mounted for up and down movement, a block arranged to strip material being cut by said cutter from the cutter in the up movement of the latter, and means to heat said block to prevent said material from adhering thereto." It is admitted that the invention of claim 1 differs from that of claim 5 in that it does not include "means to heat said block."

The alleged invention of the quoted claim comprises the following elements: (a) a Reciprocating Carrier Frame disposed be-

tween and slidably mounted in vertical guideways; (b) a Cutter Frame secured to the lower sides of the carrier frame and horizontally disposed over a conveyor; (c) a Plurality of Longitudinal and Transverse Knives, intersecting at right angles, supported within and on the cutter frame; (d) a Stationary Stripper Block horizontally disposed within the carrier frame and immediately over the cutter frame but independently mounted to permit the reciprocal movement hereinafter described; (e) a Plurality of Stripper Heads, formed by a plurality of longitudinal and transverse channels in the under surface of the stripper block, so disposed as to permit the reciprocal movement of the knives in the channels and in relation to the stripper heads; and (f) an Electric Heater disposed within the stripper block. The specification discloses independent means to heat the cutter frame, but this is not claimed as an element of the invention.

The operation of this machine is fully and adequately described in the specification. The slice of butter is cut into segments on the downward stroke of the knives and these segments are thereafter ejected by the stripper heads on the upward stroke of the knives. The heated stripper heads, a feature only of claims 5 and 6, overcome the tendency of the chilled butter to adhere to these elements and thus facilitate the stripping operation.

### Prior art.

The Lary Patent—683,693—issued October 1, 1901, covers a manually operated machine utilized to cut and divide a block of butter into a plurality of prints of equal size and weight. The invention of this patent is broadly defined in claim 7 as follows: "An apparatus for cutting and molding butter comprising a support, a movable frame having intersecting cutting-ribs for forming pockets, the upper end of the pockets being closed by a transverse wall fixed to the movable frame, said wall having an aperture for each of the pockets, plungers or followers movable in the pockets and provided with stems projecting through the apertures, said plungers being movable independently of each other, means movable independently of the plungers and adapted to operate said plungers to discharge the butter from the pockets, and an additional means to raise and lower the frame."

When the quoted claim is interpreted in the light of the specification it is obvious that the invention of Lary comprises the following structural elements: (a) a Reciprocating Cutter Frame slidably mounted in vertical guideways and horizontally disposed over a receptacle in which the butter is placed; (b) a Plurality of Longitudinal and Transverse Knives, intersecting at right angles, supported within and on the cutter frame; (c) a Reciprocating Stripper Plate slidably mounted on a vertical guideway or bearing and horizontally disposed over the cutter frame; and (d) a Plurality of Stripper Heads secured to the under surface of the stripper plate. The cutter frame and the stripper plate are independently mounted to permit not only the reciprocal movement of the knives in relation to the stripper heads but also the reciprocal movement of the stripper heads in relation to the knives.

The Powell Patent—1,399,873—issued December 13, 1921, covers a positively actuated machine utilized to imprint a plurality of designs or legends on a sheet of dough and then cut the sheet of dough into small cakes. The invention of this patent is defined in claim 3 thereof as "the combination of a platen, a plurality of design stamps carried thereby, in a staggered row, and a plurality of peripheral cutters carried by said platen in a staggered row, parallel to and spaced apart from said stamps, a clear plate below said platen, having openings through which said stamps and cutters are adapted to pass, a back plate above the platen, means for rigidly securing the back plate and clear plate together, strippers mounted inside said cutters, secured to said back plate and movable relatively to said platen, and spring means between said platen and clear plate."

The invention of Powell comprises, in addition to other structural elements, the following: (a) a Reciprocating Cutter Frame or plate slidably mounted on vertical guideways and horizontally disposed over a conveyor; (b) a Plurality of Circular Knives

secured to the under surface of the cutter frame or plate; (c) a Reciprocating Stripper Plate horizontally disposed immediately over the cutter frame but independently mounted to permit the reciprocal movement hereinafter described; (d) a Plurality of Stripper Heads secured to the under surface of the stripper plate and slidably mounted within the circular knives. The cutter frame and the stripper plate are independently mounted to permit not only the reciprocal movement of the knives in relation to the stripper heads but also the reciprocal movement of the stripper heads in relation to the knives, a feature disclosed also by the Lary patent, supra.

The Raia Patent—1,343,932—issued June 22, 1920, covers a treadle actuated machine utilized to cut a block of ice cream "into a large number of portions." It is therein stated that an object of the invention "is to provide a machine * * * including a plurality of vertically movable knives designed to cut the ice cream, and means for heating said knives whereby they may accomplish their work more effectively."

The invention defined in each of the claims of this patent comprises the following structural elements: (a) a Reciprocating Carrier Frame disposed between and slidably mounted in vertical guideways; (b) a Cutter Frame secured to the upper sides of the carrier frame and horizontally disposed over a table; (c) a Plurality of Longitudinal and Transverse Knives, intersecting at right angles, supported within and on the cutter frame; (d) a Stationary Frame horizontally disposed over the cutter frame but independently mounted to permit the reciprocal movement hereinafter described; (e) a Plurality of Hollow Blocks secured to the under surface of the stationary plate and spaced to form a plurality of longitudinal and transverse channels, which are so disposed as to permit the reciprocal movement of the knives in the channels and in relation to the blocks; and (f) a Plurality of Gas or Electric Heaters disposed within the hollow blocks.

The specifications of the patents to both Lary and Powell disclose that their inventions operate in the same manner as the alleged invention of Rottenberg. The plastic material, either butter or dough, is cut into segments on the downward stroke of the knives and the segments are thereafter ejected by the stripper heads on the upward stroke of the knives, after the cutting operation has been completed. The reciprocal movement of the knives in relation to the stripper heads is essential in the inventions of Lary, Powell and Rottenberg, and in each of them this reciprocal movement is effected in substantially the same manner.

The utilization of an electric heater as "means" to heat the knives, in a combination similar to Rottenberg's, is clearly taught by Raia. The heated Stripper Heads employed by Rottenberg are similar to the heated Hollow Blocks disclosed by Raia, and it cannot be denied that they function in substantially the same manner to heat the knives by radiation. We agree that in the invention of Raia the "hollow blocks" do not perform the function of stripper heads but the dual utility of these elements would be obvious to the person skilled in the art to which the patent in suit pertains.

### Discussion.

■ The structural elements employed by Rottenberg in his alleged invention, or their equivalents, are disclosed by the prior art in similar combinations in which they perform identical functions in substantially the same manner. The claims in suit are therefore invalid because of anticipation. Gilbert v. Marzall, 87 U.S.App.D.C. 1, 182 F.2d 389, 394; Ranco, Inc. v. Gwynn, 6 Cir., 128 F.2d 437, 443; Lyman Gun Sight Corp. v. Redfield Gun Sight Corp., 10 Cir., 87 F.2d 26, 28. The decision of the Court, however, does not rest on this ground alone.

■ The claims in suit must be construed in the light of the prior art, considered in its entirety. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, and other cases hereinafter cited. When these claims are thus construed the complete absence of patentable invention is evident. The alleged invention comprises nothing more than an assemblage of old elements, or their structural equivalents, in a combination in which they perform no new or different function. It is well established that such

an assemblage is not a patentable invention. Textile Machine Works v. Louis Hirsch Textile Co., 302 U.S. 490, 58 S.Ct. 291, 82 L.Ed. 382; Altoona Public Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005; Hutchinson Mfg. Co. v. Mayrath, 10 Cir., 192 F.2d 110, and other cases hereinafter cited.

The positively actuated machine described in the specification and defined in the claims of the patent in suit was an improvement over the prior art, but it was not a patentable improvement. It would have been obvious to the person skilled in the art to which the patent in suit pertains that the combination cutter and stripper disclosed by both Lary and Powell could be easily modified and thus adapted to cut a slice of butter into segments or pats suitable for table use. The necessary modification and adaptation of the structural elements required nothing more than the expected skill of the art.

This conclusion is supported by the evidence before the Court. It clearly appears that in the normal development of the dairy industry those who followed Lary and Powell utilized the same elements, or their mechanical equivalents, in combinations in which they perform the same functions as theretofore in substantially the same manner.

### Rottenberg Patent.
### ('872)

The plaintiff is the owner of this patent, which issued May 21, 1940 on an application filed April 2, 1937. The patent covers a machine therein identified as a "Cutting, Shaping, Embossing, and Wrapping Machine for Butter or Similar Plastic Material." The structural elements of this machine are hereinafter described.

The alleged invention is defined in claim 4, the only claim here in issue, as follows: "In a butter cutting machine of the character described, a butter slicing mechanism, a feed mechanism, means for actuating said feed mechanism for feeding a supply of butter to said slicing mechanism, means functioning immediately after each slicing operation to turn the sliced part of the butter to an advanced position, means for moving the turned slice of butter to a forward position, and embossing means for embossing the butter after it has been moved to said forward position, and operating means for cutting the embossed butter into small blocks with the embossed legends central of each block."

The alleged invention of this claim comprises the following devices:

(1) A positively actuated belt Conveyor —described in the specification as a "feed mechanism" and identified therein as "station B"—which is utilized to feed a supply of butter, preshaped and of predetermined size, to the slicer hereinafter described. The conveyor is disposed ahead of the slicer and operates intermittently so that upon each forward movement the supply of butter is advanced a "predetermined distance," three-eighths of an inch more or less.

(2) A Slicer—identified in the specification as "station C"—which operates automatically after a predetermined portion of butter, advanced in the manner hereinabove described, is in position under the cutting wire. The slicer comprises: (a) a cutting wire disposed and held taut in a vertically reciprocating frame; and (b) a "spring pressed member" disposed immediately ahead of the cutting wire. The movements of these elements are so synchronized that upon the downward movement of the frame the "spring pressed member" comes in contact with the supply of butter, as distinguished from the slice being cut, and holds it in position during the slicing operation.

(3) A Transfer Carrier—described in the specification as a "gripper mechanism," and identified therein as "station D"—which is disposed immediately behind the slicer. This carrier consists of a pair of spring actuated clamp members disposed between and secured to a pair of spaced arms pivotally mounted on appropriate mechanism which swings the carrier in an arc of ninety degrees. This device performs two functions successively: first, it holds the slice of butter in a vertical position during the slicing operation, and second, transfers the slice of butter to a conveyor and deposits it thereon in a horizontal position. The latter function is performed on the downward swing of the carrier, upon the completion of which the clamp members are

released, and the carrier is then returned to a vertical position. The operations of the transfer carrier are synchronized with the operations of the slicer.

(4) A positively actuated roller Conveyor—identified in the specification as "station E"—which is utilized to feed the slice of butter to the imprinter. This conveyor is disposed immediately behind the slicer and ahead of the imprinter and operates intermittently so that upon each forward movement a slice of butter is advanced to a position under the imprinter.

(5) An Imprinter—described in the specification as the "embossing rolls" and identified therein as "station F"—which is disposed immediately behind the conveyor, "station E," and ahead of the combination cutter and stripper. The imprinter comprises: (a) a pair of rotating cylinders in vertical alignment, and (b) an imprinting plate removably mounted on each of the cylinders; the upper cylinder is vertically adjustable so that the imprinter may be adapted to receive a slice of butter of any desired thickness. The plates impress the desired legends or designs on the slice of butter as it passes between the cylinders, which are preferably heated. It should be noted, however, that the heaters are not claimed as an element of the invention.

(6) A combination Cutter and Stripper—identified in the specification as "station G" —which is disposed immediately behind the imprinter. This device cuts and divides a slice of butter, previously imprinted in the manner hereinabove described, into small segments or pats suitable for table use.

The combination comprises: (a) a Reciprocating Carrier Frame suitably mounted on vertical rods; (b) a Cutter Frame, which is preferably heated by means in common use in the industry, secured to the lower sides of the carrier frame and horizontally disposed over an "auxiliary table"; (c) a Plurality of Longitudinal and Transverse Knives, intersecting at right angles, secured to the cutter frame; (d) a Stationary Stripper Plate horizontally disposed within the carrier frame and immediately over the cutter frame but independently mounted to permit the reciprocal movement hereinafter described; (e) a Plurality of Stripper Heads secured to the under surface of the stripper plate and so disposed as to permit the reciprocal movement of the knives in relation to the stripper heads.

The combination Cutter and Stripper reads on and is responsive to claims 1, 5 and 6 of the earlier patent to Rottenberg. The structural elements are similar to those of the alleged invention of the earlier patent and, in the combination here described, perform the same function in substantially the same manner; the slice of butter is cut into segments on the downward stroke of the knives, and these segments are thereafter ejected by the stripper heads on the upward stroke of the knives. It is apparent that in the operation of both devices the reciprocal movement of the knives in relation to the stripper heads is effected in the same manner.

### Prior art.

The conveyors claimed by Rottenberg as elements of his alleged invention, elements (1) and (4), supra, were known in the industry prior to his patent and were used, as in his machine, as feeders. The cited references disclose several variants: a gravity actuated roller conveyor; a roller conveyor in combination with a positively actuated gripper mechanism; a positively actuated conveyor in combination with a series of carrier trays mounted thereon; and a belt conveyor, mounted on idlers, in combination with a spring actuated pusher. (See Hilgers, '748; Doering, '540; Rottenberg, '972; Heineman, '047; infra.) The utilization of conveyors as feeders is taught by each of these patents.

The Hilgers Patent—1,486,748—issued March 11, 1924, covers a machine utilized to cut and wrap butter or other plastic material. The invention of this patent is broadly defined in claim 4 as follows: "A combined molding and wrapping-up machine for butter, margerine, and the like, comprising, in combination, a press adapted to deliver a beam of the material to be proceeded with; a wrapping-up machine arranged in front of the delivery opening of said press on a lower level; a set of rollers so arranged as to be adapted to allow pieces of said beam of material to roll down to said wrapping-up machine; a flap ar-

rangcd at the lower end of said set of rollers; cutting means locatcd near to the said press and being adapted to be operated by hand for cutting off comparatively long pieces of the beam of material; a cutting slide located near to the said flap and being adapted to be automatically operated and to cut off from one of said long pieces such short pieces as are to be wrapped up; and grippers so arranged as to be adapted to grip one of said short pieces and convey it to the wrapping-means; said rollers, said cutting slide, and said grippers, being covered with parchment paper."

The invention of this patent comprises the following elements:

(1) A gravity actuated roller Conveyor, which is utilized as a feeder. This conveyor, except the forward rollers, is disposed ahead of the slicer, hereinafter described, and is suitably adapted to permit the intermittent feed of butter to the slicer.

(2) A Slicer, which is disposed over the forward rollers of the conveyor. The slicer consists of a vertically reciprocating knife disposed between and slidably mounted in a pair of vertical guideways. This device operates automatically after a predetermined portion of butter is advanced to a position under the knife.

(3) A Transfer Carrier—described in the patent as a "gripper"—which is disposed immediately behind the slicer. This carrier consists of a pair of spring actuated clamp members pivotally mounted on appropriate mechanism which swings the carrier in an arc of approximately ninety degrees. This device, the operations of which are synchronized with the operations of the slicer, transfers the slice of butter to a suitable receptacle mounted on a conveyor; this function is performed on the downward swing of the carrier, upon the completion of which the clamp members are released and the carrier is then returned to its normal position.

The Doering Patent—1,858,540—issued May 17, 1932, covers a machine "designed and adapted to wrap butter prints or bricks or articles of similar shape and dimensions." The specification discloses that the structural elements of the machine "may be changcd and varied" and the machine thus adapted to wrap "articles of sizes and shapes differing from those of conventional butter prints or bricks." The significance of the reference lies in the comprehensive disclosures of the specification.

The specification discloses and adequately describes the following devices:

(1) A roller Conveyor in combination with a positively actuated gripper mechanism, which is disposed ahead of the slicer hereinafter described. This device is utilized as a feeder and operates intermittently so that upon each forward stroke of the gripper mechanism the supply of butter, preshaped and of predetermined size, is advanced a predetermined distance.

(2) A Slicer, which operates automatically after a predetermined portion of butter, advanced in the manner hereinabove described, is in position under the cutting wire. This device consists of a cutting wire disposed and held taut in a vertically reciprocating frame.

(3) A Transfer Carrier which is disposed immediately behind the slicer. This device consists of an L-shaped platform pivotally mounted on appropriate mechanism which swings the platform in an arc of ninety degrees. The transfer carrier, the operations of which are synchronized with the operations of the slicer, performs two functions successively: first, it holds the print or slice of butter in position during the slicing operation, and second, transfers the print or slice of butter to the next station, the wrapper.

The Heineman Patent—2,107,036—issued February 1, 1938 on an application which was filed January 2, 1935 and renewed on June 23, 1937. This patent covers, in addition to a wrapping machine therein described, a machine utilized to cut and divide butter into small segments or pats suitable for table use. The patentee states in his specification that an "object of the invention is to provide a machine * * * (in which) a predetermined block or mass of material will be separated into equal fractional portions * * *, and in which such fractional portions will be subdivided into individual servings, * * *." The additional objects stated in the specification are irrelevant.

The invention of this patent comprises the following devices:

(1) a belt Conveyor in combination with a spring actuated pusher, which is disposed ahead of the primary slicer hereinafter described. This device is utilized as a feeder and operates intermittently so that upon each forward movement of the pusher the supply of butter, preshaped and of predetermined size, is advanced a predetermined distance. The conveyor consists of a pair of belts mounted on idlers and extended longitudinally over the table.

(2) a primary Slicer which is disposed over the forward end of the conveyor. The slicer consists of a vertically reciprocating knife disposed between and slidably mounted on a pair of vertical bearings. This device operates automatically after a predetermined portion of butter is advanced to a position under the knife.

(Note: This slicer cuts the butter into prints which are generally rectangular and a quarter pound in weight. When this operation is completed the print is moved to the secondary slicer by a positively actuated pusher.)

(3) A secondary Slicer which cuts and divides the print into small segments or pats suitable for table use. This device consists of a cutting wire disposed and held taut in a vertically reciprocating frame. This slicer operates automatically when the butter is positioned under the wire.

(4) A Transfer Carrier which is disposed immediately behind the secondary slicer. This carrier consists of a pair of positively actuated clamp members pivotally mounted on appropriate mechanism which swings the carrier in an arc of ninety degrees. This device performs two functions successively: first, it holds the slice of butter in a vertical position during the slicing operation, and second, transfers the slice of butter to a table and deposits it thereon in a horizontal position. The latter function is performed on the downward swing of the carrier, upon the completion of which the clamp members are released and the carrier is then returned to a vertical position. The operations of the carrier are synchronized with the operations of the secondary slicer.

It will be observed that the secondary slicer differs from the primary slicer only in the utilization of a wire instead of a knife as a cutting means and in its adaptation to its peculiar function, to wit, the slicing of smaller quantities of butter. It will be further observed that both the wire and the knife are mounted in suitable frames which are similar in construction and differ only in size.

The Rottenberg Patent—'972, supra—is limited to the invention hereinabove described, to wit, the combination cutter and stripper. The specification of this patent, however, discloses and adequately describes the following devices:

(1) A positively actuated Conveyor which consists of a pair of endless chains or belts in combination with a series of carrier trays mounted thereon. This conveyor is utilized as a feeder and operates intermittently so that upon each forward movement a slice of butter, previously cut, is advanced a predetermined distance. This conveyor is similar, except in structural detail, to the conveyors employed in the alleged invention of the claim in suit, elements (1) and (4), supra, and performs the same function in substantially the same manner.

(2) An Imprinter which comprises: (a) a rotating cylinder with an electric heater disposed within it, and (b) an imprinting plate removably mounted thereon. The imprinter is so disposed over the conveyor that upon each forward movement of the latter and the simultaneous rotation of the former, the desired legends or designs are impressed upon each slice of butter as it is carried under the imprinter. The linear speed of the conveyor and the rotary speed of the imprinter are synchronized to permit continuous operation. This device differs from the imprinter employed in the alleged invention of the claim in suit, element (5), supra, only in an unimportant structural detail, to wit, the utilization of a single rotating cylinder, but it performs the same function in substantially the same manner.

(3) A combination Cutter and Stripper which is disposed over the conveyor and immediately behind the imprinter. This device, as hereinabove noted, comprises the same structural elements as the combination cutter and stripper employed in the alleged invention of the claim in suit, (6), supra, and performs the same function in substantially the same manner.

### Discussion.

■ The essential elements of the alleged invention, or their mechanical equivalents, were known in the industry and are disclosed in the prior art; in fact, these elements, except the transfer carrier and the slicer, were known to the patentee and are disclosed in the specification of his earlier patent, '972. The alleged invention differs from the machine described in the earlier patent only in the adaptation and utilization, in the assemblage defined, of two additional devices, to wit, the transfer carrier disclosed in the Hilgers and Heineman patents and the slicer disclosed in the Hilgers, Doering and Heineman patents. The adaptability and utility of these devices would have been obvious to the person possessed of the expected knowledge and skill of the art.

The alleged invention may be an improvement over the machine described in the earlier Rottenberg patent, but the improvement, if any, is ascribable solely to the adaptation and utilization of the transfer carrier and the slicer. This improvement is clearly one which would have readily occurred to the person skilled in the art and is therefore not patentable. This conclusion is supported by the cases hereinafter cited.

■ The claim in suit covers nothing more than an assemblage of several old devices which, in the assemblage, perform no new or different function and produce no new or different result than that theretofore performed and produced by them. It is well established that such an assemblage is not patentable. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra; Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Toledo Pressed Steel Co. v. Standard Parts, 307 U.S. 350, 59 S. Ct. 897, 83 L.Ed. 1334; Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; Altoona Publix Theatres v. American Tri-Ergon Corp., supra; Grinnell Washing Mach. Co. v. E. E. Johnson Co., 247 U.S. 426, 38 S.Ct. 547, 62 L.Ed. 1196; General Motors Corp. v. Estate Stove Co., 6 Cir., 201 F.2d 645; Packwood v. Briggs & Stratton Corp., 3 Cir., 195 F.2d 971; Hutchinson Mfg. Co. v. Mayrath, supra; Park-In-Theatres v. Perkins, 9 Cir., 190 F.2d 137; Butex Gas Co. v. Southern Steel Co., 5 Cir., 123 F.2d 954. The claim is therefore invalid.

The language adopted by the Supreme Court in the case of Grinnell Washing Mach. Co. v. Johnson Co., supra, is apposite. It is therein stated, 247 U.S. at page 432, 38 S.Ct. at page 549, 62 L.Ed. 1196: "It must be conceded that a new combination, if it produces new and useful results, is patentable, though all the constituents of the combination were well known and in common use before the combination was made. But the results must be a product of the combination, and not a mere aggregate of several results, each the complete product of one of the combined elements. The combined results are not necessarily a novel result, nor are they an old result obtained in a new and improved manner. Merely bringing old devices into juxtaposition, and there allowing each to work out its own effect without the production of something novel, is not invention. No one by bringing together several old devices without producing a new and useful result, the joint product of the elements of the combination and something more than an aggregate of old results, can acquire a right to prevent others from using the same devices, either singly or in other combinations, or, even if a new and useful result is obtained, can prevent others from using some of the devices, omitting others, in combination." (This quotation is taken from Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L.Ed. 241.)

The claim in issue is so drafted as to embrace, as essential elements of the "combination" therein defined, not only the transfer carrier and slicer, which the pat-

entee here contends are improvements on the earlier devices, but also the devices disclosed and fully described in the earlier Rottenberg patent, to wit, the conveyor, imprinter, and combination cutter and stripper. We may assume, but only for the purpose of argument, that the transfer carrier and slicer are patentable improvements over similar devices of the prior art, but it is obvious that they were not claimed as such. They were claimed in conjunction with old devices in a "combination" in which the devices, the new as well as the old, perform no new or different function.

The claim is therefore invalid because of its failure to meet the requirements of the statute. Lincoln Co. v. Stewart-Warner Corp., supra; Bassick Mfg. Co. v. R. M. Hollingshead Co., 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251; Aetna Ball & Roller Bear. Co. v. Standard Unit Parts Corp., 7 Cir., 198 F.2d 222, 227; see also Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. at page 150, 71 S.Ct. 127, 95 L.Ed. 162. The earlier statute, 35 U.S.C.A. § 33, requires the patentee to define his invention accurately, and to "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention * * *." Section 112 of the Patent Codification Act, 35 U.S.C.A. § 112, prescribes the same requirements. General Motors Corp. v. Estate Stove Co., 6 Cir., 203 F.2d 912, 916. We are of the opinion that the claim in issue is so broad that it fails to meet this requirement.

"The statutory requirement of particularity and distinctness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field. Moreover, the claims must be reasonably clear-cut to enable courts to determine whether novelty and invention are genuine." United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 236, 63 S.Ct. 165, 170, 87 L. Ed. 232.

There must be a strict adherence to the requirements of the statute where, as here, the alleged invention comprises a "combination" of old devices, and certain improvements thereon, in a machine in which they perform no new or different functions. It was held in Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 10, 67 S.Ct. 6, 11, 91 L.Ed. 3: "Patents on machines which join old and well-known devices with the declared object of achieving new results, or patents *which add an old element to improve a preexisting combination,* easily lend themselves to abuse. And to prevent extension of a patent's scope beyond *what was actually invented,* courts have viewed claims to combinations and improvements or additions to them with very close scrutiny. Cf. Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549–551, 58 S.Ct. 662, 82 L.Ed. 1008. For the same reason, courts have qualified the scope of what is meant by the equivalent of an ingredient of a combination of old elements. Gill v. Wells, 22 Wall. 1, 28, 29, 22 L.Ed. 699; Fuller v. Yentzer, 94 U.S. 288, 297, 298, 24 L.Ed. 103. It is quite consistent with this strict interpretation of patents for machines which combine old elements to require clear description in combination claims." (Emphasis by the Court.)

### Doering Patent.
#### ('523)

The intervenor is the owner of this patent which issued July 6, 1943 on an application filed March 27, 1939. This patent covers a machine which cuts and divides a slice of butter into small segments or pats suitable for table use and simultaneously imprints any desired legend or symbol on each of the segments or pats. The structural elements of this machine are hereinafter described.

The claims here in issue are 6 and 7. The alleged invention is defined in claim 7, which is typical, as follows: "In a device of the character described, the combination with confronting members, of means for displacing said members relatively to each other, cutting means on one of said members to

cooperate with the other of said members, surface impressing means mounted on the same member with said cutting means for movement relative thereto, the other of said members being a substance supporting platen to coact with said cutting means through the medium of a plastic material therebetween, said surface impressing means comprising individual rectangular dies and a rigid holder therefor, said cutting means comprising intersecting blades between said rectangular dies and a holder on which said blades are rigidly mounted, spring means interposed between said holders for mounting the former holder so as to be capable of motion relative to the latter holder, and temperature control means operatively connected to said cutting and surface impressing means to facilitate the conversion of a plastic material to a plurality of surface impressed segments."

The specification of the patent describes a machine which comprises the following structural elements: (a) a Stationary Carrier Frame—identified as a "rectangular housing"—in alignment with and horizontally disposed over the platen hereinafter described; (b) a Cutter Frame secured to the lower sides of the carrier frame and horizontally disposed over the platen; (c) a Plurality of Longitudinal and Transverse Knives, intersecting at right angles, supported within and on the cutter frame; (d) a spring actuated Die Plate—the mechanical equivalent of the Stripper Plate disclosed in the prior art—horizontally disposed within the carrier frame and immediately over the cutter frame but independently mounted to permit the reciprocal movement hereinafter described; (e) a Plurality of Dies—the mechanical equivalent of the Plurality of Stripper Heads disclosed in the prior art—suitably mounted on the under surface of the die plate and spaced to form a plurality of longitudinal and transverse channels which are so disposed as to permit the reciprocal movement of the dies within the knives and in relation thereto; (f) a Hot Water Heater, to the under surface of which the die plate is secured, suitably mounted within the carrier frame; (g) a Vertically Reciprocating Platen which is suitably constructed to hold a slice of butter, prefashioned and of predetermined size, while it is cut and imprinted.

The operation of the machine is fully and adequately described in the specification. The slice of butter is simultaneously cut into segments and imprinted on the upward movement of the platen, and these segments are thereafter ejected by the dies on the downward movement of the platen. (See page 4 of the specification.) The heat imparted to the knives and the dies in the manner described in the specification overcomes the tendency of the chilled butter to adhere to these elements.

The claims in issue are, however, not limited to the machine described in the specification. They are so drafted as to cover also any obvious variant in which there is a substitution of equivalents, particularly a machine in which a Reciprocating Carrier Frame is substituted for the Stationary Carrier Frame. It should be obvious that in a machine thus modified, the reciprocating carrier frame may be disposed over a stationary plate, suitably mounted, or any one of the several types of Conveyors hereinabove described. This construction of the claims in issue is in accord with that here urged by the intervenor.

### Discussion.

The alleged invention of the disputed claims comprises an aggregation of old elements, or their mechanical equivalents, in a machine in which these elements perform no new or different function. The claims must therefore be construed in the light of the prior art, considered in its entirety, and scrutinized "with a care proportioned to the *difficulty* and *improbability* of finding invention in an assembly of old elements." (Emphasis by the Court.) Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra, 340 U.S. at page 152, 71 S.Ct. at page 130, 95 L.Ed. 162, and other cases hereinabove cited. We are of the opinion that when thus construed the claims in issue are invalid because of the lack of patentable invention over the prior art. Ibid; see also Powers-Kennedy Contracting Co. v. Concrete Mixing Co., 282

U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278; Busell Trimmer Co. v. Stevens, 137 U.S. 423, 11 S.Ct. 150, 34 L.Ed. 719.

The structural elements employed by Doering, or their mechanical equivalents, were disclosed earlier by Rottenberg in a similar combination in which they perform the same functions as in the alleged invention of Doering and in substantially the same manner. Similar elements, except the heater, were disclosed by both Lary and Powell, supra, in combinations in which they perform the same functions in substantially the same manner; the utilization of heaters in similar combinations was disclosed not only by Rottenberg but also by Raia, supra.

The essence of the alleged invention, and incidentally the only feature which differentiates it from the earlier devices, lies in: first, the utilization of a Plurality of Dies instead of the Plurality of Stripper Heads disclosed by Rottenberg, Lary and Powell; and second, the disposition of the dies within the Plurality of Longitudinal and Transverse Knives. The dies differ from the stripper heads only in the addition thereto of impression plates mounted on the under surfaces; they are otherwise identical in construction and are similarly disposed within the knives in the manner disclosed in the cited references. This modification may have been an improvement on the earlier devices but, when viewed in the light of the prior art, it was not a patentable improvement. The conception is one that would have been obvious to the person possessed of a knowledge of the art and the expected ingenuity of the skilled mechanic.

The specification of the Powell patent, supra, discloses that prior to his invention the arrangement of elements here claimed by Doering as novel, was in common use in an analogous art. It is therein stated, on page 1, lines 9 to 33, inclusive, "My invention relates to apparatus for stamping or embossing designs on a sheet of dough and cutting around the designs to form cakes or the like, which are subsequently to be baked, and each of which carries one of the designs formed thereon. In the Present Practice a Sheet of Dough is Progressed Intermittently on a Suitable Support Below a Platen Which Carries a Row of Cutting Knives Adapted to Cut in the Dough the Outlines of Cakes Having a Desired Configuration. Within Each of the Inclosing Cutters is Mounted a Die or Stamp for Embossing a Design Upon the Cake, the Outline of the Cake Being Thus Cut and the Design Formed Simultaneously. With this construction it is necessary to have a stripping member, known as a 'clearer,' mounted within the peripheral or inclosing cutter and outside the design stamp, this stripping member acting to hold down the dough, to prevent the same from sticking to the cutter and the stamp, and rising with the same when the platen rises." (Emphasis by the Court.)

This disclosure, interpreted in the light of the specification, reads upon and is responsive to the combination defined in the claims in issue. The alleged invention differs from the device described by Powell only in the elimination of the "clearers," a modification which would have been obvious to the skilled mechanic possessed of a knowledge of the physical properties of butter. The clearers were essential in the machine described by Powell only because of the physical properties of dough. The elimination of the clearers, an expedient adopted by Doering, would have been obvious to the person skilled in the art to which the patent in suit pertains; the heated dies—the mechanical equivalent of heated stripper heads known in the art—perform, in addition to their usual function, the function of clearers.

The intervenor here contends that the plurality of dies does not perform the function of the plurality of strippers. This contention is rather tenuous and is supported only by the testimony of the intervenor's employees. We are firmly convinced that the plurality of dies performs the dual functions ascribed to them not only in the specification of patent '523 but also in the specification of patent '188, hereinafter discussed.

Doering Patent.
('188)

The intervenor is the owner of this patent which issued June 8, 1943 on an ap-

plication filed April 21, 1939. This patent purportedly covers a "method," defined in claim 6, which is typical, as follows: "A process of producing preformed bricks of plastic dairy substances which consists in extruding the plastics through a preformed constriction having superposed dividers to form a series of large superposed sheets of adhering thin slabs, then severing the superposed slabs into uniform lengths that are not self-sustaining nor form-retaining unless supported on their entire flat bottom surfaces, then separating the superposed slabs with paper liners, then pressing each slab to simultaneously divide and mold impress a surface design in uniform segments thereof, and then ejecting the divided and impressed segments from the cutting and molding instrumentalities." Claim 5, which defines a similar "process," is also in issue.

The specification of the patent recommends the use of the devices therein described in the practice of the method defined in the claims. These devices are: (a) a suitable Extruder disclosed in earlier patents to Doering and admittedly in common use in the industry prior to the patent in suit; (b) a Cutter Frame vertically disposed and secured to the discharge throat of the extruder, in substantially the manner disclosed in an earlier patent to Doering; (c) a Plurality of Cutting Wires, vertically spaced and held taut within the cutter frame, which cuts the butter as it is discharged from the extruder into superposed but separable slabs of desired thickness; (d) a Roller Conveyor disposed behind the cutter frame; (e) a Pair of Cutting Wires, suitably mounted in a cutting frame, which cut the superposed slabs of butter transversely into slices of desired size; (f) a combination Cutter and Imprinter, which is described not only in the specification of this patent but also in the specification of patent '523, supra

### Discussion.

When the claims in issue are construed in the light of the specification, it is apparent that the successive steps of the purported method are the characteristic and peculiar functions of the devices described in the specification and recommended therein as the means by which the method may be practiced. The claims are functional and therefore invalid. Ludlow Manufacturing & Sales Co. v. Dolphin Jute Mills, D.C., 50 F.Supp. 395, 398, affirmed per curiam, 3 Cir., 145 F.2d 471; and the cases therein cited. The language of the cited case is particularly applicable here.

"It is our firm conviction that the claims in issue do not define a patentable method but define the peculiar and characteristic functions of the elements of the apparatus recommended for its practice, and appropriately illustrated and described in the specifications of the patent. There is no suggestion in either the patent or the evidence that the method may be practiced by any other means. * * * The successive operations of the purported method, as hereinabove stated, are inherent in the elements of the apparatus as the peculiar and characteristic functions thereof. It necessarily follows that the claims in issue are invalid. Oxford Varnish Corp. v. General Motors Corp., 6 Cir., 120 F.2d 44; Risdon Iron & Locomotive Works v. Medart, 158 U.S. 68, 15 S.Ct. 745, 39 L.Ed. 899; Bauer Bros. Co. v. Bogalusa Paper Co., 5 Cir., 96 F.2d 991; Thordarson Electric Mfg. Co. v. General Transformer Corp., 7 Cir., 93 F.2d 36; Detroit Gasket & Mfg. Co. v. Fitzgerald Mfg. Co., 2 Cir., 89 F.2d 178; Black-Clawson Co. v. Centrifugal Engineering & Patents Corp., 6 Cir., 83 F.2d 116; Continental Can Co. v. Cameron Can Machinery Co., 7 Cir., 76 F.2d 173; Interstate Folding Box Co. v. Empire Box Corp., 7 Cir., 68 F.2d 500; Smith Engineering Works v. Nordberg Mfg. Co., 7 Cir., 68 F.2d 492; Chisholm-Ryder Co. v. Buck, 4 Cir., 65 F.2d 735; American Lava Co. v. Steward, 6 Cir., 155 F. 731.

"When the claims in issue are read and construed in the light of the prior art, as they must be, the absence of patentable invention seems to be clearly demonstrated. The successive operations of the purported method are inherent in devices of the prior art,

several of which were admittedly in common use and others of which were disclosed by patents of the prior art. It is particularly significant here that these devices, and the elements of which they are comprised, are not only adaptable to the said operations, but the said operations are inherent in them as their normal and intended functions. It follows that the claims in issue, since they define the peculiar and characteristic functions of the apparatus recommended for the practice of the purported method, are anticipated by the devices of the prior art in which these functions are inherent. Saranac Automatic Mach. Corp v. Wirebounds Patents Co., 282 U.S. 704, 51 S.Ct. 232, 75 L.Ed. 634; Goodman v. Paul E. Hawkinson Co., 9 Cir., 120 F.2d 167; Gamble-Skogmo Inc. v. Paul E. Hawkinson Co., 8 Cir., 98 F.2d 37; Claude Neon Lights, Inc. v. E. Machlett & Son, 2 Cir., 27 F.2d 702; In re Watson, 44 F.2d 868, 18 C.C.P.A., Patents, 712. However, claims which are so drafted as to embrace the functions of earlier apparatus are void, not because they are anticipated, but because they are functional. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 423, 424, 425, 22 S.Ct. 698, 46 L.Ed. 968.

Conclusions.

I.

Claims 1, 5 and 6 of Rottenberg patent '972 are invalid for the reasons herein stated.

II.

Claim 4 of Rottenberg patent '872 is invalid for the reasons herein stated.

III.

Claims 6 and 7 of Doering patent '523 are invalid for the reasons herein stated.

IV.

Claims 5 and 6 of Doering patent '188 are invalid for the reasons herein stated.

(*Note:* It should be noted that in our determination of the issue of patentability we have given due and proper consideration to the provisions of the Patent Codification Act.)

Claim for Damages Under the Antitrust Laws.

The intervenor has joined in his counterclaim a claim for treble damages under Section 4 of the Clayton Act, 15 U.S.C.A. § 15. The counterclaim alleges: first, that the plaintiff has made and entered into certain license agreements, in violation of Section 3 of the said Act, 15 U.S.C.A. § 14, and Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2; and second, that these agreements have effectively lessened competition and created a monopoly, to the injury and damage of the intervenor. The essential allegations of the counterclaim are denied in the reply filed by the plaintiff.

Illegality of License Agreements.

The plaintiff and the intervenor are admittedly competitors engaged in the manufacture of machines which are either leased or sold to producers and wholesale distributors of butter products. They are engaged in interstate commerce, and the agreements hereinafter discussed were made "in the course of such commerce." The purchasers and lessees of the machines are also engaged in interstate commerce; their products are sold and distributed "among the several States."

The machines of the plaintiff, which are covered by Rottenberg patents '972 and '872, supra, are leased to nineteen of the largest producers of butter products. The standard form of lease contains the following restrictive covenant: "The lessee agrees as a special and additional consideration for the granting of this lease and license to use the machinery of the lessor, * * * that it will not produce, deal in, sell, offer for sale, use or deliver, nor attempt to do so either directly or indirectly, any butter printed, scored or cut, embossed or otherwise; ready or suitable for individual service or use in small pats or pieces, which is a substitute for, imitation or simulation of any butter printed, packed or distributed which is or may truthfully be described as 'A Chiplets Machine Product,' except on payment to the lessor of a sum of money equal to the additional consideration (¼¢ for each and every pound of butter) hereinabove provided for Chiplets Machine

cut butter." (Clause 9(f) of the standard form). Several of the leases contain a modification of this covenant.

The restriction of the quoted clause is reenforced by Clause 14(d), which reads as follows: "the lessee covenants for the full term of this agreement not to use, directly or indirectly, for the purpose for which the hereunder leased machinery is used, any machinery which in its design, movements, construction, operation, etc., wholly or in any of its principal functions or parts *is construed by the lessor* to be a duplication, imitation, reproduction, simulation or patent infringement of the hereunder leased machinery, regardless of the prior termination of this agreement for any cause whatsoever." The provisions of subdivisions (b) and (c) of Clause 14 are equally onerous but we see no reason to quote them at length.

We have heretofore held that the restrictive clauses contained in the license agreement violate the express provisions of Section 3 of the Clayton Act, supra. Chiplets, Inc. v. June Dairy Products Co., D.C., 89 F.Supp. 814; see, in addition to the cases therein cited, Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 355, 356, 42 S.Ct. 360, 362, 66 L.Ed. 653. The practical effect of these clauses is to preclude the use by the licensee not only of other patented machines but also of unpatented machines. There can be no doubt that the "effect" of such provisions "may be to substantially lessen competition or tend to create a monopoly." The quoted clauses therefore violate the Act.

The language of the Supreme Court in the case of Standard Fashion Co. v. Magrane-Houston Co., supra is apposite here. The Court, construing Section 3 of the Clayton Act, held that the Act embraced: "All contracts * * * which were unreasonably restrictive of competitive conditions, either from the nature or character of the contract * * * or where the surrounding circumstances were such as to justify the conclusion that they had not been entered into * * * with the legitimate purpose of reasonably forwarding personal interest and developing trade, but on the contrary were of such a character as to give rise to the inference or presumption that they had been entered into * * * with the intent to do wrong to the general public and to limit the right of individuals, thus restraining the free flow of commerce and tending to bring about the evils, * * *, which were considered to be against public policy."

We are convinced that the license agreements here under consideration were intended by the plaintiff to: first, extend the patent monopoly beyond its reasonable and lawful limits; second, suppress competition; and third, create a monopoly. This conclusion is supported by the undisputed evidence, from which it appears that these unlawful ends were at least partially achieved.

### Liability and Damages.

The burden is upon the intervenor to prove not only that the license agreements were used by the plaintiff in violation of the Act but also that their use in the course of commerce was the direct and proximate cause of injury to its business. A claim for damages may be sustained only upon proof of these elements. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 55 S.Ct. 248, 75 L.Ed. 544, et seq.; Kobe, Inc. v. Dempsey Pump Co., 10 Cir., 198 F.2d 416, 425, 426; Turner Glass Corp. v. Hartford-Empire Co., 7 Cir., 173 F.2d 49, 51, 52; Shotkin v. General Electric Co., 10 Cir., 171 F.2d 236, 238, 239. There can be no recovery in the absence of such proof.

The evidence as to the fact of damage, as well as the extent thereof, leaves much to be desired. The claim for damages is predicated solely upon an alleged loss of business, but this allegation, except in a single instance hereinafter discussed, is supported primarily by the testimony of two officers of the intervenor and the correspondence from potential customers. The conclusions expressed by these witnesses were either conjectural or based on hearsay. The correspondence was inadmissible on the issue of damage in the absence of the testimony of the writers;

we might add that much of this correspondence was irrelevant. We are of the opinion that the competent evidence, considered in the light most favorable to the intervenor, was insufficient to support the claim for damages, except in the instance hereinafter discussed.

This is not a case in which the uncertainty is limited to the extent of the damage, but one in which the uncertainty extends also to the fact of damage. Cf. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652, and Story Parchment Co. v. Paterson Co., supra. The competent and material evidence before the Court will not support a factual determination that the pecuniary damage sustained by the intervenor, if any, was attributable to the wrong of the plaintiff. The evidence may have been available, but, if it was, the intervenor failed to produce it at the trial, and this despite the frequent admonitions by the Court that the evidence presented was insufficient.

██ However, the competent and material evidence before the Court adequately supports the following factual determinations: (a) Armour and Company, a licensee of the plaintiff, submitted to the intervenor a "Purchase Order" for a Doering Automatic Machine at a net price of $10,670; (b) the said order was accepted by the intervenor; (c) thereafter, and before the delivery of the machine, the order was cancelled by Armour and Company on the advice of its legal department; (d) the existence of the license agreement was advanced as the reason for the cancellation; and, (e) the intervenor sustained a net loss of $2,370, the equivalent of a net profit of approximately twenty-two per cent. The undisputed evidence, and the inferences of which this evidence is reasonably susceptible, will support a conclusion that this loss was occasioned by the wrong of the plaintiff.

### Conclusion.

The intervenor is entitled to recover "threefold the damages" sustained by it, to wit, $7,110. A judgment in said amount, plus costs, in favor of the intervenor and against the plaintiff may therefore be entered.

### Claim for Injunctive Relief Under the Antitrust Laws.

The issues raised by the claim for injunctive relief have become moot, and we therefore see no reason to discuss them.