**OXFORD VARNISH CORPORATION et al.**
**v. GENERAL MOTORS CORPORA-**
**TION et al.**

No. 8221.

Circuit Court of Appeals, Sixth Circuit.

May 16, 1941.

W. J. Belknap, of Detroit, Mich., A. R. Golrick, of Cleveland, Ohio (Whittemore, Hulbert & Belknap, William J. Belknap, and William H. Gross, all of Detroit, Mich., and Bates, Golrick & Teare, of Cleveland, Ohio, on the brief), for appellants.

Stuart C. Barnes, of Detroit, Mich. (Barnes, Kisselle, Laughlin & Raisch, Stuart C. Barnes, and Arthur Raisch, all of Detroit, Mich., on the brief), for appellee.

Before HICKS, ALLEN, and MARTIN, Circuit Judges.

ALLEN, Circuit Judge.

This is an appeal from a decree dismissing a bill of complaint upon the ground

that all claims in suit of four patents alleged to be infringed are invalid. Appellants prosecuted no appeal from the holding as to Casto and Lang, 1,807,894. The case involves Claims 1, 2 and 5 of Henry 1,548,465, issued August 4, 1925; Claims 7 and 8 of Von Webern and Hamant, 1,900,030, issued March 7, 1933, and Claims 1 and 4 of Casto and Von Webern, 1,946,483, issued February 13, 1934.

Appellant Oxford Varnish Corporation manufactures wood-graining equipment and licenses such equipment and methods under patents to which it has title. Appellant Motor Products Corporation is an exclusive licensee of Oxford Varnish Corporation for the automotive industry. Appellee Ternstedt Manufacturing Company manufactures automotive parts for motor cars built by appellee General Motors Corporation, and appellee Cerre Company produces photogravure plates used in the processes alleged to infringe. Ternstedt Manufacturing Company also manufactures the devices alleged to infringe under the Von Webern and Hamant and the Casto and Von Webern patents.

■ We first consider the Henry patent, and in this connection discuss at the outset the assignment of error directed to the refusal of the trial court to strike out paragraph 30 of the answer and the court's construction of the legal effect to be given the evidence introduced in this phase of the case. The principal facts alleged in paragraph 30 are proven by voluminous evidence, and the District Court's summary of them in its findings of fact and opinion is conceded by appellants to be "substantially accurate." It appears that Oxford was sued by the National Cash Register Company, then owner of the Henry patent, and by the Vance Manufacturing Company, for infringement. All parties were fully informed of the Cott-a-lap prior use, hereinafter described, and joined in asking the advice of an eminent patent attorney, who gave his considered opinion that in view of the Cott-a-lap use it was "questionable" whether the patent would withstand attack on validity, and recommended settlement. Oxford, the National Cash Register Company, and Vance then joined in a consent decree which held the Henry patent valid. Among other things Oxford paid $150,000, received all the stock of the Vance Manufacturing Company, and acquired the Henry patent, for which it gave licenses thereafter for a nominal consideration to parties that in any way acquired knowledge of the Cott-a-lap prior use. It purchased the engraving business of the Cott-a-lap Company, making its payments therefor run through the life of the Henry patent. Thereafter Cott-a-lap, when questioned as to the prior use of the photogravure process for reproducing wood grains, referred the inquiry to Oxford and at the latter's direction wrote a letter calculated to mislead the parties inquiring and to throw them off the scent as to the validity of the Henry patent. Oxford, as party plaintiff, entered into a second consent decree in the Eastern District of New York, which held all the claims of the Henry patent valid and infringed. Under the decree the alleged infringer purported to pay $25,000 damages, but a release and waiver of this amount was in the hands of the infringer before the decree was signed and payment was never made. Ample evidence exists sustaining the finding of the District Court that the parties were trying to use a worthless patent, known to them to be invalid, to stifle competition and regulate prices. Although the record showed substantial commercial success and the issuance of many licenses under Henry, the District Court held that the Henry patent should be accorded no greater presumption of validity than if it had been an ordinary paper patent. We think that this conclusion was correct, and must be affirmed. The negotiations and the circumstances surrounding them and the issuance of two consent decrees of this nature went very far to explain the success of the Henry patent. Whether or not by deliberate design, Oxford's system of giving parties who disputed the patentability of the Henry process or were in the possession of dangerous information a financial stake in the maintenance of its validity must have had a powerful effect in the decision of other corporations to accord or deny recognition of the patent.

■■ The fact that a process has been recognized by competitors as a new and valuable contribution is entitled to consideration as evidence of invention. New Process Fermentation Co. v. Maus, 122 U. S. 413, 7 S.Ct. 1304, 30 L.Ed. 1193. It follows that facts tending to account for such apparent recognition on some other basis are also pertinent, and particularly when that basis is one of substantial financial advantage resulting from the sup-

pression of facts relevant to the authenticity of the recognition. The character of the license agreements executed indicates that they were sought because of the nuisance value of a patent valid on its face and untested on the merits in adversary litigation. As in John E. Thropp's Sons Co. v. Seiberling, 264 U.S. 320, 330, 44 S.Ct. 346, 350, 68 L.Ed. 708, this was a case where the "purchase of peace" was a wise course for the licensees and also particularly wise for Oxford, the licensor. A similar contention that the giving of many licenses demonstrated patentability was overruled in Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 356, 59 S.Ct. 897, 83 L.Ed. 1334, affirming 6 Cir., 93 F.2d 336.

The District Court did not err in denying the motion to strike paragraph 30 from the answer nor in ruling that the evidence offered thereunder was relevant as bearing upon and diminishing the weight to be accorded evidence of the general acceptance of the patent with reference to the question of validity.

The Henry patent is for a process for the reproduction of wood grain. The Von Webern and Hamant patent is for a surface decorating machine, and the Casto and Von Webern patent is for a surface decorating method and apparatus, both to be used with the Henry process.

Appellees reproduce wood grain on metal automobile parts and use such parts, and this is claimed to be infringement of the Henry patent. They use devices and processes claimed to infringe the other two patents. Appellees admit that the claims in suit of the Henry patent "will read on what we do," but contend that the process is old. They deny infringement of the other two patents. Assuming that appellees' answers to the interrogatories in evidence establish infringement of all three patents if they are valid, we consider the contest as turning upon validity.

The Henry patent states that its purpose is the reproducing of the graining of woods on substances other than woods, such as sheet steel. Claim 2 is typical of the claims in suit, and reads as follows:

"The process of reproducing the grain of wood on a solid surface which consists in staining the piece of wood to be simulated to accentuate the grain thereof; producing a photographic negative of the wood so prepared; producing from the negative a grained plate, the recesses produced by the graining varying in depth with the shade to be produced and arranged to simulate the graining of the original material; filling the plate with coloring matter; withdrawing the coloring matter from the recesses of the grained plate by means of an elastic roller to which the coloring matter adheres; transferring the coloring matter from the elastic roller to the surface to be grained and merging the masses one into the other so as to obliterate the lines of union."

The Henry application had a stormy history in the Patent Office. It was rejected repeatedly by the examiner for lack of invention, and on appeal the board of examiners in chief and the commissioner of patents sustained the examiner.

In an appeal taken to the Court of Appeals of the District of Columbia [In re Henry, 55 App.D.C. 396, 6 F.2d 699], it was held that the process was patentable. The only prior art presented before that court was Herzog, 700,493, Saalburg, 923,-799, Leicester, 13,987 (British patent), and a London Times article on Rembrandt Photogravure. Owing to the failure of the Patent Office's representative to present other instances of prior art, the court had the misconception that "the only prior patent in this particular art was that to Herzog," and since neither Herzog, Saalburg, nor Leicester, in the view of the court, solved the problem of transferring to a metal surface a "facsimile of the intricate grains of wood," the court ordered the issuance of the patent.

In the instant case many other prior patents were presented and numerous instances of prior art and prior uses not before the Court of Appeals of the District of Columbia. We agree with the District Court that every step of the Henry process is old. Many of the steps are described in the specifications as well known to the prior art. They teach that the natural wood desired to be reproduced is stained and photographed, reproducing the grain in negative "by the usual photographic process." A positive is then made in the "ordinary" manner from which a print is taken on a sensitized photogravure carbon tissue paper such as is "ordinarily employed" in the intaglio process of printing. The print is exposed to light through a Rembrandt screen "well known in the art of rotary photogravure" so as to break the etched area into small recesses or cells, which it is claimed results in re-

taining the proper amount of stain. The print is reproduced in intaglio on metal plate and etched "by the usual process of etching a copper plate." A soft roller transfers the stain to the part to be grained.

Every step of the process is old, but appellants say that a new result is secured in a new way, and that this constitutes patentable invention. While beautiful examples of wood-graining are presented by appellants as part of their case, appellants' expert concedes that these results are not entirely secured by a practice of the Henry teaching. Also the record clearly establishes that the results are not secured in any new way. Contrary to the conclusion of the Court of Appeals of the District of Columbia, at the time of Henry's application the conception of reproducing natural wood-grain was old. It is shown in Silver's machine for graining lumber (805,100). McIndoe & McIndoe, 295,658, issued March 25, 1884, and the British patent to Gray & Ridley, 15,-291, issued March 30, 1911, disclose graining by photogravure. The McIndoes state that their invention "relates to the art of manufacturing paper, cloth, leather, etc., finished to represent the finished surface of natural woods," and they obtained a print which is used for the purpose of securing an electrotype by the photo-electrotype process which shows "the grain, knots, etc., in relief." Gray & Ridley states that "The primary object of this invention is to reproduce exactly on cork carpets and linoleums wood grain or other natural figures or designs, and with this object the design is engraved upon a copper printing roller from an actual photographic impression of the natural wood or the like and not from a hand prepared draughtsman's design, so that the printing roller has reproduced on it in intaglio an exact copy of the natural wood-grain or the like." Day, 194,997, and Pelstring, 523,235, disclose wood graining from engraved metal rolls with the use of a transfer roll, as in Henry.

■ Obviously it is immaterial from the standpoint of patentable invention that the subject of Henry's reproduction is wood. The fact that a new subject is reproduced does not establish the validity of a process patent unless the method of reproduction is new. Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 473, 55 S.Ct. 449, 79 L.Ed. 997;

Fry v. Rookwood Pottery, 6 Cir., 101 F. 723.

■ The District Court held the claims invalid not only because of lack of invention but also because of various prior uses. The Charles W. Shonk Company, the Magill Weinsheimer Company, and the American Art Works, photographed natural wood and made printing plates therefrom by the lithographing process prior to Henry's application. The Nashua Gummed and Coated Paper Company photographed a wood grain printed on paper before that time. Clearly there was no invention in substituting well-known methods of photogravure for the well-known method of lithographing. Moreover, the Cott-a-lap Company used the exact photogravure process of Henry two years prior to his application date. Stirling, an employee of Cott-a-lap, made engraved rolls from natural wood by photogravure in August, 1913. A company was formed in 1914 by Cott-a-lap and Stirling to manufacture these grain rolls to be used in printing floor coverings, and in September, 1914, Cott-a-lap began to print linoleums from them. Certain of the linoleums were grained on a copper roller and disclose wood grain patterns called parquetry flooring. The trade names Flooroleum and Plankoleum were used and the linoleums were advertised for sale in the Montgomery Ward catalogue for the year 1914. There is no substantial difference between the Cott-a-lap process and the Henry process. The appellants contend that Cott-a-lap did not secure the intermediate tones which are obtained by the use of the Henry process. However it is plainly shown that the Cott-a-lap process was capable of securing intermediate tones; that it did secure them, and that because of the special needs of the linoleum manufacture, the patterns were retouched so as to eliminate intermediate tones. There is no invention in employing a well-known process like photogravure so as to bring out the intermediate tones which are normally secured by the process. A combination of old elements does not secure a patentable process because it produces a refined or improved result unless the new result is attained in a new way.

Moreover, in printing wall papers, Cott-a-lap did not modify the natural process and printed wood graining, both of quarter-sawed oak and straight grain oak,

which display numerous intermediate tones. Stirling, appellants' employee, employed by Cott-a-lap in 1914 and 1915, called the pictures of the wood made by this process on wall paper "as good as the original." In 1914 and 1915 Cott-a-lap printed large quantities of these wall papers which were sent to Sears, Roebuck & Company, and Stirling admitted that in one year there were "carloads" of them. While the printing on the wall papers was done directly instead of by the offset printing which was used with linoleum, in other respects the graining on wall papers was the exact counterpart of Henry.

Appellants contend that its showing of great commercial success should turn the scale in favor of validity of the Henry patent; but where, as here, the patent discloses no invention over the prior art, commercial success is of no avail to establish validity. Toledo Pressed Steel Co. v. Standard Parts, Inc., supra; Paine & Williams Co. v. Baldwin Rubber Co., 6 Cir., 113 F.2d 840, 841; Lempco Products, Inc. v. Timken-Detroit Axle Co., 6 Cir., 110 F.2d 307.

We conclude that all the claims of the Henry patent in suit are invalid for lack of patentable invention, and also because of the prior use of Cott-a-lap.

Von Webern & Hamant, 1,900,-030, is a patent for a machine designed to carry out the method of the Casto & Von Webern patent, 1,946,483. The primary object of the machine patent is to provide a graining or surface decorating machine which will be capable of decorating surfaces of blanks of various shapes, hollow articles such as boxes, U- and L-shaped blanks. It was difficult, with machines then in use, to grain articles with irregular shapes or a plurality of deviating surfaces without a large number of operations and without special supports. The claim is made that the present machine handles boxes or similar shapes without special adapters or mandrels, and grains or decorates these surfaces in a continuous manner.

The claims in suit are 7 and 8, which read as follows:

"7. A surface decorating machine, comprising a frame, a transfer applying roll rotatably mounted on a substantially vertical axis carried by the frame, a pattern roll mounted to rotate on a second substantially vertical axis carried by the frame, a pigment well located in said frame, means to apply pigment from the well evenly to said vertical pattern roll, a guide adjacent the roll for supporting work and a roller projecting upwardly from the supporting surface of the guide, there being means below the guide to carry the roller into contact with work on the guide, and press the same against the transfer roll.

"8. In a surface decorating machine, a frame, an upright transfer roller rotatably mounted thereon, means for applying a pigment pattern to the transfer roller, a table to support a thin sheet metal blank adjacent the transfer roller, with the lower edge of the blank resting thereon, an arm pivoted to said frame, an upright pressure roller mounted thereon and projecting freely from the table adjacent said transfer roller, whereby the work may be introduced between the roller by a movement parallel to the axis of one of the rollers, and the rollers rocked together by a pressure on the pivoted arm with sufficient pressure to cause the work to be advanced while guided on the table and simultaneously printed."

The machine comprises the usual pattern roll, transfer roll and pressure roll, all of which are vertically disposed and the blank or piece to be worked upon rests upon a supporting table. Ink is supplied to the pattern roll by a spiral pump and scraped from the pattern roll and the transfer roll by doctor-blades. The work is positioned between the transfer roll and the pressure roll with its weight supported on the table, and as the pressure roll presses the blank against the transfer roll, the blank passes between them. Appellees' machine also discloses the vertical rolls and the table.

We think it not necessary to discuss in detail the difference between the two machines. It is true that the patent in suit calls for even distribution of ink, which is not even attempted by the appellees' machine. Many of appellees' devices have slidable instead of pivoted arms to move the rollers, and in appellees' machines the pressure roll is locked in position so that it cannot separate from the transfer roll as in the patented device. We prefer to decide this phase of the case upon what we think is the plain lack of patentable invention in the machine patent.

Some of the claims as first drawn were rejected in the Patent Office on Nagy, 1,-

487,591, in view of Hornung, 689,189, but similar claims were later allowed upon the contention of the patentees' solicitor that a patentable distinction over Nagy resided in the fact that Nagy has a sliding arm upon which the movable roller is mounted, while the patent in suit discloses a pivotal arm. Also the point was stressed that Nagy's rolls are horizontal while the rolls of the patent in suit are vertical. These seem to us to be distinctions without a difference. Making the rolls vertical instead of horizontal, as disclosed by Nagy, is a mere transposition of parts not amounting to invention. Lees-Bradner Co. v. National Tool Co., 6 Cir., 52 F.2d 782; Lyman Gun Sight Corp. v. Redfield Gun Sight Corp., 10 Cir., 87 F.2d 26.

Claim 7 is invalid as constituting an aggregation. The ink well and ink pump do not coact with the other parts of the machine, and the mere aggregation of parts does not constitute a patentable combination. Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L. Ed. 1008; Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 356, 59 S.Ct. 897, 83 L.Ed. 1334.

The table is the plain equivalent of the flange disclosed in Brausil, 590,200. There was no invention in tipping the rolls and in supplying a support for the work. The problem of disposing of long strips of material and of material of uneven shape in the process of being fabricated or decorated is not unusual. We think the method of solving it was obvious to any skilled mechanic.

The method patent, 1,946,483, relates to a method of continuously applying wood grain finish to boxes and irregular shapes. Claims 1 and 4 are in suit, and read as follows:

"1. A method of decorating the surfaces of articles having relatively abrupt bends, comprising supporting the article adjacent a moving pigment applying member, continuously supplying a pigment pattern to the member, and continuously applying rolling pressure to the surface of the article opposite the pigment applying member to thereby cause the article to be frictionally driven bodily while allowing it to swing freely in the general plane of the article as required by the successive bends thereof."

"4. The method of decorating articles having surfaces deviating from a single plane, said surfaces having edges lying in a common plane, comprising supporting the entire weight of the article on a guide contacting the edges, presenting the surfaces to a moving pattern transfer member and continuously applying rolling pressure to the other side of the article surface opposite the pattern transfer member, and thereby causing the pattern to be continuously transferred to the contacted surface while the article swings freely, supported on the guide."

The appellees claim that they do not infringe this patent because they do not decorate surfaces with abrupt bends. Assuming, however, that they are able to decorate the L- and U-shaped blanks described, we think that the District Court was correct in holding that the patent discloses no invention. It was repeatedly rejected in the Patent Office on Hornung. Silver, 805,100, shows a graining process which will pass "curved or bent materials." The transfer roll of Brausil, 590,200, prints continuously and operates on work supported by the flange of the lower roll which "swings freely with the guide." Gail, 1,-702,769, employs a separable roll.

Also these claims of the method patent disclose nothing but the mechanical operations performed by the machine patent, 1,900,030. They are claims for the characteristic function of the Von Webern & Hamant machine, and are therefore void. Black-Clawson Co. v. Centrifugal Engineering & Patents Corp., 6 Cir., 83 F.2d 116; Ratigan v. Deckard Supply Co., 10 Cir., 91 F.2d 722; Thordarson Electric Mfg. Co. v. General Transformer Corp., 7 Cir., 93 F.2d 36; Bauer Bros. Co. v. Bogalusa Paper Co., 5 Cir., 96 F.2d 991; McDaniel v. Friedman, 7 Cir., 98 F.2d 745; Detroit Gasket & Mfg. Co. v. Fitzgerald Mfg. Co., 2 Cir., 89 F.2d 178.

The decree is affirmed.