**WEST SHORE MANUFACTURING CO.,**
Plaintiff,

v.

**WESSON COMPANY, Defendant.**

**Civ. A. No. 12870.**

United States District Court
E. D. Michigan, S. D.

Feb. 16, 1959.

Supplemental Findings of Facts
May 15, 1959.

Paul & Paul, Henry Paul, Jr., Austin R. Miller, Philadelphia, Pa., for plaintiff.

Barnes, Kisselle, Raisch & Choate, Detroit, Mich., Arthur Raisch, Robert A. Choate, Detroit, Mich., for defendants.

THORNTON, District Judge.

The complaint herein alleges that West Shore Manufacturing Co. is a Pennsylvania corporation doing business in that state, and that the defendant, Wesson Company, is a Michigan corporation with a place of business in the greater Detroit area. It also alleges that on August 25, 1953, United States Letters Patent No.

2,649,647 for a toolholder were duly and legally issued to West Shore Manufacturing Co., as assignee of Solon A. Sternbergh and Charles S. Knabb, and that since this date West Shore Manufacturing Co. has been and still is the owner of the said Letters Patent. Plaintiff further complains that the defendant, Wesson Company, has since August 25, 1953, infringed, and still is infringing, said Letters Patent by selling and offering for sale toolholders embodying the patented invention. Plaintiff further claims that a large number of toolholders embodying the aforesaid Letters Patent have been made and sold by plaintiff, and that these toolholders have been favorably accepted by the trade and by the public.

In answer to the foregoing, the defendant admits the issuance of Letters Patent No. 2,649,647, but denies that they were legally issued; denies that it has been, or is infringing said Letters Patent, and denies that the plaintiff is being damaged or injured in any respect by defendant's activities; denies that it had any notice from the plaintiff that it was infringing the named Letters Patent, and claims that it is without knowledge as to what is the invention in the Letters Patent in suit, and denies that there is any invention therein. It is further asserted by the defendant that the patent in suit is invalid and void for the following reasons:

"(a). The alleged invention was known and used by others in this country, and patented and described in printed publications in the United States and foreign countries before the alleged invention thereof by the said Solon A. Sternbergh and Charles S. Knabb.

"(b). The alleged invention was patented and described in printed publications in the United States and foreign countries and in public use and on sale in this country more than one year prior to the date of the application for patent in suit in the United States.

"(c). The alleged invention was described in patents granted on applications for patent by others filed in the United States before the alleged invention thereof by the said Solon A. Sternbergh and Charles S. Knabb.

"(d). The said Solon A. Sternbergh and Charles S. Knabb did not themselves invent, solely or jointly, the subject matter sought to be patented.

"(e). Before the alleged invention of the subject matter of the patent in suit by the said Solon A. Sternbergh and Charles S. Knabb, the said alleged invention was made in this country by others."

*     *     *     *     *     *

"12. The patent in suit is invalid and void for the reason that it does not particularly point out and distinctly claim the subject matter which the applicant regards as his invention.

"13. By reason of the proceedings in the United States Patent Office during the prosecution of the application which resulted in the patent in suit, and the admissions and representations therein made by or on behalf of the applicant in order to induce the grant of said patent, Plaintiff is estopped to claim for said patent a construction, were the same otherwise possible, such as would cause said patent to cover or include the acts of the Defendant of which the Plaintiff complains."

The presentation of the facts and law in support of the respective claims of the parties was extensive, and the plaintiff now advances the argument that the testimony has established that its patented toolholder represents the principal objects of the invention in that the tool bit or insert is rigidly supported, easily removable and readily adjustable, while toolholders designed by others failed to provide the true embracing relation that is characteristic of the patent in suit, the Sternbergh-Knabb invention, thus

failing to achieve the major object of the patent here in suit, which is to provide rigid support for the tool bit. The plaintiff further contends that the evidence supports its claim that although others prior to Sternbergh-Knabb had conceived the idea of utilizing various forms of wedges or screw-urging clamping devices for forcing a tool bit against a toolholder, none had employed the combination of a tool-embracing clamp movably carried on a holder, and a rotatable screw with a tapered portion in engagement with the tool-embracing clamp, and serving to draw the clamp back against the holder; that none had employed elements of the character and in the special relationship which is more particularly defined in the claim, nor had anyone succeeded in establishing the requisite rigidity of support for the tool to minimize vibration and resultant breakage, either of the tool or its holder under everyday operations, particularly intermittent cuts; that toolholders, prior to the Sternbergh-Knabb invention, fell into three general categories—the split type, the plate type, and the bulldog type—and the toolholder in each category was designed for use with vertical inserts of carbide, but difficulties were experienced with all of these types and, except for occasional orders for replacement parts, their manufacture has apparently ceased. There is general agreement in the trade that a tool bit must be held very rigidly and solidly in order to prevent inaccurate work and breakage. A constant problem since the beginning of the tool art has been how to minimize vibration and chatter, especially relative movement between the cutting tool and its holder. This problem became more acute when carbide bits were first made available in the early thirties. (Carbide, while extremely hard, is also very brittle). Sternbergh and his associates, who had experience with split type, plate type and bulldog type holders, found that all three types failed when used on interrupted cuts, and often caused smashups in the operation by reason of their inability to clamp the carbide inserts with the necessary rigidity. Inventors were attempting to provide a toolholder which would rigidly support the tool bit and yet permit the same to be easily removed and replaced, or adjusted to a new position, but the earlier tools failed on tough work for many reasons. Contemporaneously with efforts to solve this problem was the feeling in the trade that it would be most advantageous to maintain all movable parts within the confines of the side planes of the holder shank so that one toolholder could be placed in close side-by-side relation to another. The plaintiff further contends that the evidence establishes that Sternbergh-Knabb was the first to put together in a toolholder the combination of a rotative screw having tapered portion in engagement with the tool bit embracing member and designed to draw that tool bit into rigid contact with the forward end of the toolholder; that all of the claims of the patent in suit are based upon this combination; that it is novel and inventive, and non-obvious; and that the proofs show an element for element correspondence between the toolholder shown in the Sternbergh-Knabb patent in suit and the accused toolholder made and sold by Wesson.

The contentions of the defendant, on the other hand, as summarized by it are:

"Claim 8 of the Sternbergh-Knabb patent is representative, and reads as follows:

"8. In a tool holder, a body having an elongated cavity formed in one end thereof, said cavity extending upwardly and having a portion of its surface adapted to cooperate with a portion of the outer surface of a tool bit, a clamping member movably carried on said holder, locking means, clearance means in said clamping member for both said bit and said locking means to extend therethrough, said locking means comprising a rotatable screw having a conical portion integral therewith and operatively engaging said clamping member for moving the latter in a direction to wedge said

bit against said first surface, said screw also having its axis substantially parallel to the axis of said bit and acting against said clamping member in a direction opposite to the cutting edge of said tool bit to force said bit into positive engagement with said first mentioned surface portion, whereby said bit is solidly held against said body, and backing up means adjustably supported in said body with upper end contacted by the lower end of said bit.

"Ignoring the technical phraseology of patent claims, which often confuse rather than clarify, it is clear that all there is to the Sternbergh-Knabb holder is a body having a vertical cavity or recess at its forward end in which a tool bit is seated, a back-up screw for supporting and adjusting the bit at its lower end, a clamp for holding the bit in the socket or cavity, and a locking mechanism accessible from the top of the holder for drawing the clamp tightly into clamping relation with the socket and for releasing the clamp when it is desired to remove or index the bit. This structure and all of its details was abundantly shown in the prior art."

and further that the evidence adduced at the trial of the issues clearly sustains the fact that the prior art taught rigidity or rigid clamping of the bit in the holder to minimize vibration long before Sternbergh-Knabb entered upon the scene; that top-locking was not original with Sternbergh-Knabb; that all of the fundamental elements of the Sternbergh-Knabb holder were taught by the prior art; that the patent in suit is a combination patent made up from a combination of old elements that do not produce an unusual and surprising result or perform any additional or different function *in* combination than they perform separately, or out of it; that when the problem of a close stacking of the tools arose, making accessibility to the clamp-locking screws from the side of the holder impossible, then it was an obvious expedient to relocate or reposition the screws in the top of the holder so that they would be accessible; that Caterpillar Tractor Company, a customer of Wesson the latter part of 1948, was contemplating a machine operation of a cylinder liner wherein the toolholders would be used in banks, that is, stacked fairly close together in side-by-side relationship. The cap or Allen screws used for holding the clamp in place had to be loosened to release the clamp every time the bit would be indexed. In close stacked or side-by-side relationship these screws in the plate type holder were not accessible and Caterpillar Tractor presented this problem to Dworecki, sales engineer and contact man for Wesson with Caterpillar Tractor. The problem was solved by Wesson through the use of hexagonal-headed cap screws, these cap screws being accessible so that they could be released and tightened down as was necessary in the indexing of the bit. However, the cap screws could not be removed and removal was essential in replacing the clamping plate.

In February of 1949 Caterpillar Tractor wanted to stack the toolholders so closely together that side access to the clamp-retaining screws would be impossible. This problem was again taken up with Dworecki, and Dworecki took the plate type holder, with its transverse locking screws, and drilled a hole vertically through the top of the holder and through both of the locking screws. He then inserted a tap screw from the top of the holder into the holes in the holder and the two transverse locking screws so that, by screwing down the tapered locking screw from the top of the holder, it would act through the screws threaded into the clamp to draw the clamp against the bit in the same manner as the screws in the plate type holder drew the clamp into clamping relation with the bit. A sketch of this arrangement is Exhibit 72.

Defendant states that Dworecki was not a graduate engineer but received his training in the cutting tool art by actu-

ally working as a machine operator in a factory, then as a tool engineer at the Dodge Division of Chrysler Corporation in Chicago, Illinois, and that to Dworecki the solution of the problem was immediate and obvious. Furthermore, defendant says that top and bottom control with a single screw which permitted stacking was available as early as December of 1948 in the Jones & Lamson Company at Springfield, Vermont, by virtue of the Longe patent 2,645,844, so that months before Sternbergh-Knabb entered the field with their invention Jones & Lamson Company had their version of a satisfactory clamp and accessible locking device.

Defendant sets forth that the differences between the patented tool and the Wesson tool are: (1) the patented tool is slotted or recessed from the front to receive the plug type clamp, whereas Wesson's holder uses a spring type band which straddles the holder; (2) the Wesson band is of U-shape to straddle the body and the legs are connected to the back by a floating cross-pin insertable only from the side of the holder; and (3) the patented tool has a screw with a conical midsection which extends through the holder body so that it may be reached from either the top or bottom of this holder, whereas the Wesson holder has a single cone-point screw which is accessible only from the top of the holder or from the bottom, depending on which way it is inserted; that while the patented toolholder and the accused toolholder are both clamping a carbide bit in a holder, it is being done in a different way; that the accused toolholder and the patented toolholder were developed independently of each other. The Bader patent application on the accused toolholder and the Sternbergh-Knabb application on the patented toolholder were co-pending in the Patent Office, were examined by the same examiner and interference was not declared by the Patent Office.

The parties stipulated as follows:

"1. Wesson Tool Company manufactures the accused toolholders illustrated on Pages 1–12 of Wesson Bulletin No. 527.

"2. Wesson Company sells the accused toolholders.

"3. Both companies are incorporated in the State of Michigan.

"4. Wesson Company is a wholly owned subsidiary of Wesson Tool Company.

"5. Wesson Tool Company is hereby joined as a defendant in the above Civil Action.

"6. The Complaint will be deemed to charge Wesson Tool Company with infringement of the patent in suit by virtue of its manufacture of the accused toolholders.

"7. Wesson Tool Company hereby joins Wesson Company in the Answer to the Complaint and subscribes to each and every paragraph therein, and all defenses pleaded or otherwise noticed on behalf of Wesson Co. will be available to Wesson Tool Co.

"8. The Answer to the Complaint will be deemed to deny the charge of infringement both as against Wesson Company and as against Wesson Tool Company.

"9. Defendant's Answers to Plaintiff's Request for Admissions under Rule 36 [Fed.Rules Civ.Proc. 28 U.S.C.], filed herein on or about December 10, 1953, will be deemed to deny (in Answer to Plaintiff's Request for Admission No. 1) that Wesson Company has manufactured the toolholder exemplified by Plaintiff's Exhibit 1, but to admit that Wesson Company has sold such toolholder."

The questions presented for determination are: Is the plaintiff's patent 2,-649,647 valid, and, if valid, are claims 8–9–10–11–12 infringed? Since an invalid patent cannot be infringed, we shall first consider the issue of the invalidity of the patent.

The plaintiff produced as its expert, Wilbur C. Dickinson, a practical mechan-

ical engineer with 28 years of experience with tools and toolholders used with metal working machines, including a 5-year course in the operation of machines with cutting tools. For a great many years he was associated with experiments in cutting tools and materials for cutting tools. With this background he readily qualified as an expert of outstanding experience in this field. He was a co-worker with the inventors Sternbergh and Knabb, and in conjunction with the co-inventors he worked on an experimental toolholder before the application for the patent in suit was filed with the Patent Office. Dickinson's testimony was lengthy and quite evasive on cross-examination. In condensed form he tried to make two points: (1) that the prior art was almost completely barren of utility and on "tough work" had no utility, and (2) that the Sternbergh-Knabb patented toolholder was the answer to all of the shortcomings and failures of the art from the beginning of time; that prior to the advent of the patented toolholder almost the entire production time of his plant in cutting operations on "tough work" was consumed in scrapping toolholders, or in attempting to rebuild and salvage damaged toolholders; that the Sternbergh-Knabb patent brought spectacular results to the art and that, in 1953, while there were other toolholders that had various versions of clamping methods, in his opinion, none but the Sternbergh-Knabb toolholder was successful, and none but the Sternbergh-Knabb toolholder held the bit so rigidly as to abolish vibration. In his effort to be convincing, this expert claimed much more for the success attained by the patented toolholder in abolishing vibration than the co-inventor Sternbergh, as evidenced by the following testimony of the co-inventor Sternbergh:

"Q. Well, then, if it was the situation, how can you state as a fact that there is no vibration of the cutting bit in its cavity or socket in your tool? A. Did I state that? I don't believe I did.

"Q. That, then—

"The Court: (Interposing) I think Mr. Dickinson makes that claim. You don't make that claim, is that right?

"Q. (By Mr. Raisch) You don't make the claim, is that right, Mr. Sternbergh? A. I don't believe vibration is ever eliminated in a tool or machine; it can't be, or it never will be. It is folly to say that you do eliminate it.

*     *     *     *     *     *

"A. We have attempted to eliminate all vibrations to the very best of our ability, to minimize them.

*     *     *     *     *     *

"A. I am talking about any vibration of the bit, which could be caused by innumerable sources.

"Q. And your testimony, then, is that you have not completely eliminated vibration or chatter of the bit in its socket in the holder; is that correct? A. That is correct." (Tr. 1754–1756)

The first toolholder was patented in 1860, and from the word picture painted by Dickinson depicting the lack of utility of the prior art, including plate type, split shank type, and bulldog toolholders, the Court wonders how industry and our Country staggered through 97 years of progress—including the manufacture of munitions for ourselves and our allies for the prosecution of two world wars, the development of a system of railroads that contact every section of our country, and fleets of interstate and intrastate freight-hauling trucks that travel the highways of our Country 24 hours a day and 7 days a week, year in and year out—without the help of the Sternbergh-Knabb patented toolholder. It appears to us that the state of the prior art was not as deplorable as the expert would have us believe, and that the patented toolholder does not do all that the expert claims for it, which makes it apparent to us that the testimony of the expert was quite heavily colored with bias.

While the insecure holding of the bit in the toolholder is a factor in tool breakage, it is far from being the only factor; there are many other factors—the quality of the carbide, the material being machined, the type of machine being used, the grinding of the tool, the inattention of the operator, to name a few of the causes that contribute to smashups and tool breakage. There is not a machine that operates that does not have some vibration; all machines have it, in different degrees. There can be vibration in the part being machined, there can be vibration in the toolholder, and vibration exists due to looseness of the carbide with respect to the toolholder.

Tool breakage and/or tool failure are conditions which have not been eliminated by the advent of the toolholder patented by Sternbergh-Knabb, and while the Redy Rigid toolholder (the patented toolholder) and the Wesson toolholder (the accused toolholder) hold the insert bit sufficiently rigid to make each a practical cutting tool, the same is true of the plate type holder. There are many plate type holders still in use as practical cutting tools, although the clamp or band type holder is generally preferred by the trade. This preference exists because of the economy of replacement parts rather than superior performance, the cost of replacement parts being a primary factor in the selection of toolholders.

The single-end milled and brazed-tip carbide tool is a more rigid tool than the mechanically held tool and is capable of performing work involving difficult cuts, and was in extensive use as late as December 1957.

Because of advances in the carbide field, it is now possible to select a grade of carbide suitable to the conditions of the cutting operation during which the edges of the carbide do not chip (causing tool failure) and this is true even though the carbide is loosely held in the holder.

The shape of the carbide insert has some influence on the chatter of the operation, and chattering is also brought about by the speed and feed of the cutting operation.

We are here dealing with an art of ancient vintage, and anything that is to be done to a toolholder, particularly as it applies to the toolholders here in controversy, and as could apply to the head of the toolholder, has to be accomplished in a very small space, with the possibility of encroachment on what has gone into the head of the toolholder by prior development.

In a cutting operation an interrupted cut is more difficult than a continuous cut, and while band type holders are adaptable to more uses than plate type holders, yet plate type holders can be used on interrupted cutting operations.

From another art of ancient vintage and within the knowledge of many men, we find that a shotgun has a tapered screw that tightens up a clamp bringing the barrel of the gun into the wooden stock of the gun for the purpose of rigidity.

The principle of clamping the bit in the Gorham toolholder is the same as in the Sternbergh-Knabb patented toolholders.

All toolholders that are in use today are only as strong as the ability of their clamping devices to withstand chip wash.

If the Sternbergh-Knabb Redy Rigid toolholder does rigidly hold the bit in the holder and minimize vibration, that degree of improvement has been brought about by an assembly of old parts that have been used in combination in the prior art, thereby establishing the fact that the prior art taught rigidity and rigid clamping of the bit in the holder to minimize vibration long before the advent of the Sternbergh-Knabb toolholder. The feature of plaintiff's patent that provides top access to the cone-point screw (in order to draw the clamp or band against the bit, so that toolholders could be stacked close together for a cutting operation) was developed by a change in toolholder design and use which overcame the problem of inaccessibility. This problem—inaccessibility to the locking

screws when close stacking of toolholders is desired—with respect to the Wesson toolholder, was *previously* presented to Dworecki in February 1949, and its solution is exemplified by the following testimony:

"Q. Well, did you have any problem at this time with respect to the accessibility of the locking screws or bolts when the holders were placed in gang side by side relationship? A. Yes, we did.

"Q. And did you do anything about that problem? A. We did. We immediately sought a solution to it.

"Q. When you say 'we', whom do you mean by 'we'? A. Well, I was the service engineer on the job representing the company who furnished the holders, working in conjunction with the tool trouble men or engineers for the Caterpillar Tractor Company.

"Q. Now, how did you solve this problem of accessibility of the screws which held down, or bolts which held down the clamping plate? A. Well, when we placed the holders side by side, we no longer could get in the sides, so it was two obvious places that we could go in from, and that is the top and the bottom of the holder.

"Q. Can you tell me whether or not it is common practice in the machine tool industry to position bolts, nuts, locking screws, and the like, in a place where they are accessible? A. Definitely, because that involves the set-up time on the machine." (Tr. 839–840.)

Beginning on page 964 of the transcript, Dworecki testified further—

"The Court: Mr. Dworecki, you have Exhibit 72-A there to your left, and Exhibit 72 was the original sketch of yours, or original drawing. I believe you testified that you arrived home on a Sunday morning and drafted that; is that correct? A. To the best of my knowledge, it was a Sunday because it is my practice, after being away from home, to come into Peoria working on a job, from whatever time I arrive to whatever time I got home, to complete all my paper work on Sunday morning."

\*   \*   \*   \*   \*   \*

"The Court: The point I am interested in, what research did you engage in, in preparation for finishing 72? A. Principally, we were stuck on one job by not being able to get into the sides of the holder, so we had to have some way of getting at it either from the bottom or top. So, I wanted to reproduce the same clamping action I had, that the screw had in the side of the holder; in other words, the direct the plate up against the insert. So, there was only one way I could approach it, the sides being closed, would be from the top or the bottom.

"In this particular instance, as shown on the liner line layout, the best place to get at it for ready accessibility was from the top because the tool is in the top position. It was not in the back position turned upside down; it was in the front position.

"The Court: Well, how did you arrive at the conclusion that you could do it that way? Did you draw on the background of your experience, or did you engage in some research, book research? A. On the background of my experience. There was only one way to create the same action, and that was through a hole and a pulling action against the bolts." (Tr. 964, 965, 966, 967.)

Dworecki received his early training in the cutting tool art by working as a machine operator in a factory, and then as a tool engineer with the Chrysler Corporation, without any formal education in an engineering school. In his capacity as a mechanic skilled in the tool art, he had no difficulty in overcoming this

problem, the solution of which was readily obvious to him.

In its reply brief (pages 2–3), plaintiff argues that:

"When the history of the art is examined, particularly what has taken place during the century of time from the grant of the Stevens patent (Ex. 48) in 1860 to the present date, the conclusion is inescapable that the Sternbergh-Knabb invention was of a non-obvious character. If it were otherwise, the particular combination of elements put together for the first time by these inventors would surely have come into use at a much earlier date. Certainly the need for a toolholder with a removable and indexable cutting bit rigidly clamped thereto had long been recognized. The earlier patents show that a host of inventors labored in this field, as a result of the inability of their predecessors to find a solution to the problems involved; and the record establishes that notwithstanding the intensive and continuous effort applied by these earlier inventors, none succeeded, prior to Sternbergh and Knabb, in overcoming such problems or in finding a truly satisfactory toolholder of the removable, indexable insert type. None produced a clamp with the requisite rigidity for holding a carbide cutting tool so as to enable it to be used on tough work, without frequent splintering or breakage. * * *"

The foregoing contention by the plaintiff is not supported by the record. The direct evidence upon which the plaintiff is apparently relying to support its position has been furnished by its chief expert, Mr. Dickinson, whose exuberant appraisal of the Sternbergh-Knabb patented toolholder was grounded in bias; by Mr. Hollingsworth, who had little, if any, practical experience in the cutting tool art; and by Mr. Sternbergh, the co-inventor, who candidly admitted that the Redy Rigid toolholder had not completely eliminated vibration or chatter of the bit in its socket in the holder. It has been established by the testimony that if the insert, or bit, is not held solidly in the holder, vibration will then occur during the machining operation and, since the co-inventor Sternbergh admits that his patented toolholder has not eliminated vibration, the most that can be said in this connection is that this toolholder has changed the degree of vibration, and such a change does not constitute invention. The plaintiff proceeds on the assumption that tool failure existed in the prior art only because of a lack of rigidity in holding the bit in the holder, and upon the second assumption that the only improvement in the tool cutting art was realized with the advent of the Redy Rigid toolholder—both assumptions are negatived by the record.

In General Motors Corp. v. Estate Stove Co., 6 Cir., 1953, 203 F.2d 912, 917, Judge McAllister, in speaking of combination claims, stated in part as follows:

"* * * Where a patentee combines the best of features of old structures without the disadvantages of any of them, resulting in a substantial improvement in performance over anything which had gone before, it must be found, in order to sustain the patent, that the increase of efficiency of the new combination is an ' "unusual or surprising" consequence of the unification'; McCord Corp. v. Beacon Auto Radiator Co., Inc., 1 Cir., 193 F.2d 985, 989; or yields some 'surprising or extraordinary result'; Packwood v. Briggs & Stratton Corp., 3 Cir., 195 F.2d 971; * * *"

Applying the foregoing formula to what we have here for determination, and from the weight of the evidence, the patent in suit has not achieved any substantial improvement in performance over anything which has gone before, any unusual or surprising consequence of the unification, and has not attained any surprising or extraordinary result.

■ We conclude that claims 8–9–10–11–12, here relied upon by plaintiff, are invalid because they represent an accumulation and aggregation of long known parts and elements that do not cooperate to produce a new, non-obvious and unexpected result and are, therefore, not invention. The defendant, therefore, is absolved from the charge of infringing them.

Supplemental findings of fact and conclusions of law may be drawn by the defendant in accordance with this opinion, filed with the Court, and served on opposing counsel within 30 days. Plaintiff may, within 30 days thereafter, file its exceptions or suggested additions thereto.

Supplemental Findings of Fact

Pursuant to the Opinion of February 16, 1959 in the above-entitled cause, the following findings of fact and conclusions of law are made supplemental to the findings and conclusions of said Opinion:

1. Plaintiff, West Shore Manufacturing Co., is a corporation organized and existing under and by virtue of the laws of the Commonwealth of Pennsylvania with a place of business at Reading, Pennsylvania.

2. Defendant, Wesson Company, and Defendant, Wesson Tool Company, are corporations organized and existing under the laws of the State of Michigan with a place of business at Ferndale, Michigan. The Wesson Company is a wholly owned subsidiary of the Wesson Tool Company.

3. The patent in suit, No. 2,649,647, relating to a toolholder, was issued to S. A. Sternbergh and Charles S. Knabb on August 25, 1953 and by mesne assignments is owned by Plaintiff, West Shore Manufacturing Co.

4. The patent in suit relates to a toolholder for an indexable tool bit. In the machining of metal, the actual cutting of the metal is done by a bit made of any well-known cutting material such as tool steel, high speed steel, Stellite, or cemented tungsten carbide. Neither the specification nor the claims of the Sternbergh-Knabb patent specify the material from which the tool bit is made. In the Sternbergh-Knabb patent the indexable tool bit may take the form of a cylinder of any cutting tool alloy about one and a half inches long. The bit may have a circular, triangular or square cross section. During the cutting operation, the bit is held by a holder. The holder comprises a steel body or shank having a cavity or socket at its forward end which receives the tool bit in an upright or vertical position. The bit is positioned in the cavity with the lower end resting upon a conventional back-up screw, and the bit is retained in the cavity by a clamp which fits into a recess machined in the forward end of the body. The clamp is provided with two holes; one hole conforms in shape to the cross sectional contour of the bit, and the other hole is tapered or conical and cooperates with the tapered shank portion of a screw which is screwed into a threaded opening drilled downwardly from the top of the hole. The bit is passed through the first mentioned opening of the clamp so that when the screw with the tapered surface is turned downwardly, the clamp is forced rearwardly to thereby hold or clamp the bit in its cavity or socket.

The Sternbergh-Knabb patent does not state how the clamp is made except to indicate that the holes for the tool bit and locking screw are cut into the metal from which the clamp is made and that the clamp is hardened and ground.

5. The claims in suit are directed to a toolholder. The tool bit is not a part of the claimed invention. The Sternbergh-Knabb patent does not specify the material from which the bit is made.

6. The Wesson Company manufactures a toolholder which it is charged infringes the Sternbergh-Knabb patent. The Wesson tool comprises a steel body or shank having a cavity at the forward end for receiving a solid carbide cutting bit. The bit shown in Exhibit 81, page 80, has a triangular cross section. The lower end of the bit rests on a conventional back-up screw and the bit is re-

tained in the cavity by the spring metal clamp which is clearly shown in the photograph of the disassembled tool at the right center of page 80, Exhibit 81. The clamp is made of spring steel, is of U-shape and is provided with opposed holes at its ends. The body is provided with a transverse hole through which a pin is passed and the opposite ends of the pin engage the clamp in the opposed openings. A conventional Allen cone-point screw is turned from the top of the body into a threaded hole in the upper portion of the holder body. The lower cone point of the screw contacts the cross pin which has a whiffletree action so that the thrust of the cone point Allen screw on the cross pin draws the clamp rearwardly to hold the bit in the holder. Following the prior art, the Wesson bit is also indexable, i.e., when one cutting edge of the bit wears, the bit is indexed or rotated about its vertical axis to present a new cutting edge to the work.

7. The accused Wesson toolholder, above described, was developed independently by the Wesson Company without knowledge of the Sternbergh-Knabb tool and before the Sternbergh-Knabb tool was on the market.

8. Prior to the manufacture of the accused tool or the development of the patented tool there was in commercial public use a so-called split type holder made by the Wesson Company and others. The split type holder comprises a steel body having a cavity or socket at its forward end which receives the tool bit in an upright or vertical position. The bit is positioned in the cavity with the lower end resting upon a conventional back-up screw. The forward or socket end of the tool is cut vertically in the middle and a cut is also made on one side horizontally so that a portion of the shank is actually split. The split shank can be squeezed together by a transverse screw to clamp the bit in the forward cavity. This split type toolholder is shown in photograph Exhibit 64. The insert held in the split type holder could be indexed, adjusted and inverted in the holder recess for the purpose of presenting new cutting edges to the work.

9. Also prior to the development of the patented tool, plate type holders were manufactured and sold by the Wesson Company and in public use in large quantities. The plate type holder comprises a steel body having a cavity or socket at its forward end which receives the tool bit in an upright or vertical position. The bit is positioned in the cavity with the lower end resting upon a conventional back-up screw. The bit is retained in the cavity by a side clamp called a "plate" which fits into a recess machined in the side of the body. The plate is held in clamping position by headed transverse screws which pass through the plate and screw into threaded openings in the shank. The screws apply pressure to the plate which clamps the carbide bit in the cavity of the tool. The plate type holder, Exhibit 52, is shown in photograph Exhibit 66, and the insert or bit held in the plate type holder can be adjusted, indexed and inverted for the purpose of presenting new cutting edges to the work.

10. In the Sternbergh-Knabb patent the back-up screw upon which the bit is supported performs the same function in identically the same manner as the back-up screw in the plate type holder, Exhibits 11 and 52, and the back-up screw of each of many prior art patents such as the British patent to Gerard 174,575, the Swiss patent to Heintz 234,828, and the German patent to Ignatieff 494,973.

11. In the course of the development of the Wesson tool, Dworecki of the Wesson Company developed a toolholder, Exhibit 78, which was a variation of the plate type holder. The Dworecki tool comprises a steel body having a vertical socket at the forward end for the cutting bit with a back-up screw supporting the bit at the lower end. A plate was provided for clamping the bit in the socket. A stud or pin was connected to the clamp and located in a transverse passageway in the holder. The stud or pin had a vertical hole drilled therethrough which co-acted with a conical screw posi-

tioned in a vertical, threaded hole in the shank and which was turned from the top of the tool body to draw the clamp against the bit.

12. The prior art Bailey patent 93,-580 discloses a toolholder comprising a steel body or shank having a cavity at the forward end for receiving a cutting bit. The bit shown has a square cross section. The bit is retained in the cavity by a metal clamp or band B. Bailey characterizes his clamp as the strap B. This strap is of U-shape and provided with opposed holes at its ends. The toolholder body is provided with a transverse hole through which a pin or gib C is passed and the opposite ends of the pin engage the clamp in its opposed openings. Bailey's pin C is acted upon by a key-wedge, which key-wedge passes through the transverse hole in the body and the holes in the ends of the clamp. Bailey states:

> "C and C' represent a gib and key of the usual form, by which the strap is drawn tightly to the bit, and the latter thus firmly secured between the strap and the shank of the toolholder." (Column right, 3rd paragraph.)

Thus, in Bailey the thrust of the key-wedge on the cross pin draws the clamp rearwardly to hold the bit in the holder socket.

13. The Gorham Tool Company, of Detroit, Michigan, manufactured and sold a toolholder, Exhibit 53, in the United States since 1932. This toolholder has been in public use in the United States since 1932. The Gorham toolholder comprises a steel body having a cavity or socket at its forward end which receives the tool bit in an upright or vertical position. The bit is indexable and is retained in the cavity by a clamp which surrounds the bit and is drawn back by a draw bar in the same manner as the clamp of the Swiss Heintz patent 234,-828. A nut is screwed on the end of the draw bar at the back of the holder. The clamping action of the Gorham tool prevents vibration of the bit when in use

and the Gorham tool is used for tough cutting operations, such as railroad tires with cuts as deep as ⅜ of an inch.

14. The prior art Swiss patent to Heintz 234,828, Fig. 3, shows a toolholder comprising a body having a cavity at the forward end for receiving a cutting bit. The lower end of the bit rests upon a conventional back-up screw and the bit is retained in the cavity by a plug type clamp very similar to that shown in the Sternbergh-Knabb patent in that Heintz' plug type clamp is mounted in a recess machined into the body of the holder. Heintz' bit, following the conventional practice, is also indexable about its vertical axis to present a new cutting edge to the work whenever one cutting edge of the bit wears. In Heintz' toolholder the bit is clamped rigidly in the socket. The clamp is locked by a locking nut which is accessible from either the top or bottom or the end of the holder.

15. The prior art British patent to Gerard 174,575 shows a toolholder comprising a body having a cavity in the forward end for receiving a cutting bit. The lower end of the bit rests upon a conventional back-up screw and the bit is retained in the cavity by a spring metal clamp of U-shape which extends back to a cross member in the shank. The insert of square cross section could be adjusted and indexed in the socket, and the clamp is locked by a locking nut accessible from either the top or the bottom or the end of the holder.

16. The prior art patent to Miller 1,756,986 shows a conical point screw 14 practically identical with that used in the Wesson tool, which co-acts with a cross pin 16 for clamping a milling cutter blade 7 in the holder body of the milling cutter. The conical point screw is accessible from the top of the holder and the conical point applies pressure to the cross pin 16 in the same manner that the conical screw in the Wesson tool applies pressure to the cross pin or whiffletree which engages the clamp. In Miller the downward pressure of the screw is translated through a 90° angle as in the Wesson tool.

17. The prior art patent to Severson 2,063,128 shows a toolholder body 10 provided with a recess 11 running rearwardly from the forward end of the holder the same as the recess or passage 22 in the Sternbergh-Knabb patent. The cone point Allen screw 19 in Severson is identical with that used in the Wesson tool and is accessible from the top of the holder. In Severson the bit has a shank 13 which extends into the recess 11 in the same fashion as the clamp of the Sternberg-Knabb patent fits into the passageway 22. In Severson, when the cone point screw 19 is turned downwardly from the top of the holder, the cone point 20 co-acts with the shaft 13 of the bit to draw it rearwardly into the holder in substantially the same manner as the tapered pin of Sternbergh-Knabb co-acts with the hole 39 of the clamp 41.

18. The Wesson tool does not hold the bit sufficiently free from vibration for many machining operations. To minimize vibration the Wesson toolholder is modified, in some instances, by an additional clamp which holds the bit from the top. This holder is shown in Wesson catalog 546, page 86, Exhibit 81.

19. There are four features which cooperate to hold the bit firmly in the holder and minimize vibration. The first feature is the adjustable back-up screw upon which the vertical bit rests. The second feature is the cavity or socket in the forward end of the steel body in which the tool bit is received in upright or vertical position. The third feature is the clamp which forces the bit into the cavity or socket. The fourth feature is the means for drawing the clamp tightly against the bit so that the bit will be tightly clamped against the socket.

20. All four of the features listed in finding 19 above were old and used as a combination in each of a number of prior art patents including Gerard (British) 174,575, Ignatieff (German) 494,973 and Heintz (Swiss) 234,828. With the exception of the back-up screw which plaintiff admits is very old in the prior art, all these features are found also in Bailey 93,580.

21. In addition to the Dworecki independent development of top accessibility of the locking screw, there are a number of prior art patents each of which shows top locking, including Severson 2,063,-128, Miller 1,756,986, and Ignatieff (German) 494,973.

22. Kennametal, Inc., a recognized leader in the carbide cutting field, and Vascoloy-Ramet Corporation offer Wesson formidable competition with their carbide toolholders which clamp the bit by a clamp that contacts the top or upper end of the carbide bit, thus applying a lengthwise or axial compressive force to the bit. Such holders with top clamping are in evidence as Exhibits 54 and 55 and are shown in catalog, Exhibit 127, pages 37, 39 and 42.

23. Kennametal, Inc., also is presently manufacturing and selling in competition with Wesson a plate type holder which clamps from the side, Exhibit 128, Exhibit 127, pages 37, 38.

24. Another competitive tool which is being presently manufactured and sold extensively is the so-called throw-away holder which uses wafer-like pieces or buttons of carbide which require no grinding, Exhibit 127, pages 26 and 28. These wafers are held on the holder by means of a top clamp and are thrown away when all the cutting edges are worn.

### Conclusions of Law

1. This is a suit involving validity and infringement of Patent No. 2,649,-647, issued to Sternbergh and Knabb on August 25, 1953 and owned by the plaintiff, West Shore Manufacturing Co.

2. Jurisdiction is founded on the patent laws of the United States of America, Title 28 U.S.Code, §§ 1338 and 1400 (b).

3. The patentees are conclusively presumed to have, and unsparingly charged with, knowledge of the prior art: Mast. Foos & Co. v. Stover Manufacturing Co., 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856; Bone v. Commissioners of Marion County, 251 U.S. 134, 40 S.Ct. 96, 64 L.Ed. 188; Allied Wheel

702

Products v. Rude, 6 Cir., 206 F.2d 752, 755; Fibre Metal Products Co. v. Jackson Products, Inc., D.C.E.D.Mich.S.D., 150 F.Supp. 949.

4. To locate the locking device in a vertical position in the holder of an indexable cutting bit does not amount to invention in view of the well developed state of this particular art. Oxford Varnish Corp. v. General Motors Corp., 6 Cir., 120 F.2d 44, 49. Ajax Hand Brake Company v. Superior Hand Brake Company, 7 Cir., 132 F.2d 606, 612.